(No. 87645.—

# THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. RICHARD MORRIS, Appellant.

*Opinion filed March 18, 2004.*

FITZGERALD, J., joined by FREEMAN, J., specially concurring.

THOMAS, J., concurring in part and dissenting in part.

Charles M. Schiedel, Deputy Defender, and Allen H. Andrews, Assistant Defender, of the Office of the State Appellate Defender, of Springfield, for appellant.

James E. Ryan, Attorney General, of Springfield, and Richard A. Devine, State's Attorney, of Chicago (William L. Browers, Assistant Attorney General, of Chicago, and Renee Goldfarb, William L. Toffenetti and Alan J. Spellberg, Assistant State's Attorneys, of counsel), for the People.

CHIEF JUSTICE McMORROW delivered the opinion of the court:

Following a jury trial, the defendant, Richard Morris, was convicted of first degree murder (720 ILCS 5/9—

1(a)(1) (West 1994)), aggravated vehicular hijacking (720 ILCS 5/18—4(a)(3) (West 1994)), and aggravated kidnapping (720 ILCS 5/10—2(a)(3) (West 1994)). At a subsequent death penalty hearing, the same jury found defendant eligible for the death penalty and further found that there were no mitigating factors sufficient to preclude the imposition of a death sentence. Accordingly, the trial court sentenced defendant to death on the first degree murder conviction. The trial court also sentenced defendant to 30 years' imprisonment for aggravated vehicular hijacking and to a consecutive term of 15 years' imprisonment for aggravated kidnapping. Because defendant was sentenced to death, his appeal was brought directly to this court. Ill. Const. 1970, art. VI, § 4(b); 134 Ill. 2d R. 603.[1]

## BACKGROUND

Testimony at trial established the following facts. Around 7:40 a.m. on Saturday, December 2, 1995, Judith Dean was driving westbound on Roscoe Street in Chicago. When Dean stopped at a stoplight at the intersection of Roscoe and Ashland Avenue, she noticed a light-green, clean, shiny car in the left lane slightly in front of her car. The occupants of the car were two young African-American men. As she was waiting for the light to turn green, Dean saw four fingers wiggling and moving back and forth between the closed car trunk and the body of the car. The fingers appeared to belong to a black male.

---

[1]After the court heard oral argument in this appeal, and while the case was under advisement, former governor George Ryan commuted defendant's death sentence to life imprisonment without the possibility of parole or mandatory supervised release. *People ex rel. Madigan v. Snyder*, 208 Ill. 2d 457 (2004). Thereafter, on our own motion, this court issued an order retaining jurisdiction. Although defendant is now serving a life sentence, we continue to have jurisdiction. In the interest of judicial economy, we choose to address the merits of defendant's appeal, rather than transfer it to the appellate court.

The fingers disappeared only to be replaced by a ratchet handle. Like the fingers, the ratchet handle was moving back and forth. The traffic light then changed to green, and the shiny green car proceeded west on Roscoe. Dean turned right onto Ashland and pulled into a gas station, where she called 911. Later that night, Dean heard on the 10 p.m. news that there had been a carjacking and a body found in Roscoe Village. Dean again called 911 and told the dispatcher what she had seen that morning.

At 7:45 a.m. that same day, Chicago police officers Stephen Lotts and Michael Lopresti were driving westbound on School Street in Chicago. At the intersection of School Street and Paulina Avenue, Lopresti observed a silvery, bluish-green car traveling southbound on Paulina. The car, a 1995 Chevrolet Impala, traveled through the intersection and continued southbound on Paulina. Lopresti made a left turn onto Paulina. The driver of the Impala, later identified as defendant, parked the car at 3250 N. Paulina. Lopresti stopped his squad car slightly behind the Impala. Two men, defendant and his codefendant, Tywon Knight, got out of the Impala and walked across the street in front of the squad car. As they were walking past the squad car, defendant and Knight made eye contact with the officers and gave the officers a look that Lotts characterized as "one of surprise and shock, and fear when they saw us." Defendant and Knight continued walking until they reached the curb that was in front of an alley. Defendant and Knight then began to run eastbound into the alley.

Officers Lotts and Lopresti exited their squad car and gave chase. Knight was apprehended at 7:48 a.m. Lotts stayed with Knight until a squad car arrived to transport him to the police station. Lotts then returned to the car parked at 3250 N. Paulina and called in the license plate—ETM 734. Meanwhile, Lopresti continued

to chase defendant. Several other officers joined Lopresti in the chase. At 7:50 a.m., Lopresti pulled defendant from a pile of construction debris in a garage. Lopresti handcuffed defendant and had another officer transport him to the police station.

Also on Saturday, December 2, 1995, Officer Robert Hanrahan was working a 7 a.m. to 3:30 p.m. shift. Around 7:50 a.m., Hanrahan received a dispatch to go to an alley at 1830 West Newport to respond to a call of a man shot. When Hanrahan arrived on the scene at 7:53 a.m., he discovered a man lying on the ground bleeding profusely from the head. Hanrahan took the victim's wallet out of his pocket and learned that his name was Ervin Shorter. Hanrahan broadcast Shorter's name over the radio to the other district officers.

At 8:10 a.m., Officers Lotts and Lopresti learned that the Impala was registered to Ervin Shorter. Having heard the registration information over his radio broadcast, Hanrahan radioed Lotts and Lopresti and told them that the victim of the shooting was the owner of the automobile they were inquiring about. The following day, December 3, 1995, Dean identified the Impala as the car she had observed at the intersection of Roscoe Street and Ashland Avenue.

The victim, Ervin Shorter, was a 58-year-old employee of the City of Chicago. Shorter worked as a laborer with the Department of Streets and Sanitation. In December 1995, Shorter worked a 10 p.m. to 6 a.m. shift.

Shorter was killed by two gunshot wounds to the head. One bullet had lodged in the rear of Shorter's skull. The other bullet had traveled through the brain, exited near the left ear, penetrated the left upper arm, and then fell out of that wound. Police officers recovered this bullet from the scene of Shorter's murder. In addition, when officers traced the route of the chase, they recovered a set of keys to Shorter's car, a .357 Magnum revolver with

two fired shells, three live rounds and one empty chamber, a fully loaded .32-caliber chrome-plated revolver, and a green glove. Officers also discovered a shoe impression next to the .357 Magnum.

Both the bullet recovered from the scene of Shorter's murder and the bullet recovered from Shorter's body were fired by the .357 Magnum. The green glove found along the chase route matched a glove recovered from defendant at the police station. The design pattern on the bottom of defendant's gym shoe was similar to the design pattern observed in the shoe impression next to the .357 Magnum, although no individual characteristics were present which would support an opinion as to a match.

Following his arrest, defendant signed a statement in which he admitted his role in the crime. Defendant's statement was introduced into evidence at trial. In his statement, defendant indicated that he was 22 years old and was married to Lyda Antia. On December 2, 1995, defendant, Lyda, and defendant's friends, Tywon Knight and "Taz" (Brian Hoover), drove in Knight's Buick Park Avenue from Kenosha, Wisconsin, to University Park, Illinois. Knight told defendant that they could get a pistol in University Park. As they were driving, defendant, Hoover and Knight discussed robbing a bank. Defendant had some problems in Kenosha and needed money so that he could hide out with his uncle in Atlanta.

When they arrived at University Park, defendant, Hoover and Lyda waited in the car while Knight went into a home and got a pistol. They then drove to another home and fell asleep. Early the next morning, they left and headed toward Chicago. The plan was that Lyda would go into a bank and check out the security cameras. Hoover would get the money, while defendant and Knight, who had guns, kept everyone at bay. As they were driving, they pulled off the Dan Ryan expressway at

Garfield Boulevard. They saw a new Chevy Impala in a Kentucky Fried Chicken parking lot. Defendant said he thought the owner of the Impala was a drug dealer and suggested that they rob the owner of his money and his car. Knight pulled into the Kentucky Fried Chicken parking lot and pulled alongside the Impala. Defendant awakened Lyda and told her to drive Knight's car.

Hoover and Knight had guns and got into the Impala with the owner between them. Defendant got into the backseat of the Impala, and Hoover gave him a .357 to keep the owner under control. Defendant had Knight pull down a street into an alley, got the owner out of the car, and forced the owner into the trunk of the car. Defendant then got into the driver's seat of the Impala with Hoover in the passenger's seat. Knight got into the Buick with Lyda. They got back onto the expressway, eventually exiting at Ashland Avenue. Defendant and Lyda pulled their cars over, and defendant told everyone that he was looking for a place to kill the owner of the Impala and was looking for a bank to rob. Defendant then got into the driver's seat of the Buick with Lyda and had Knight and Hoover follow in the Impala.

Defendant saw some banks on Ashland Avenue, one of which had a banner indicating that it was open from 8 a.m. to noon. Defendant decided they had to find someplace to kill the Impala's owner because the bank he wanted to rob opened in around 20 minutes. Defendant pulled into an alley, stopped the car, got the car's owner out of the trunk and ordered him to his knees. The car's owner began begging for his life, at which point defendant shot him twice. Defendant and Knight got back into the Impala, pulled out of the alley and saw a police car. Shortly thereafter, defendant parked the Impala and the police again drove up. Defendant and Knight jumped out of the car and ran. Defendant left the .357 and the keys to the Impala in the alley as he ran.

Defendant testified at trial. Defendant's trial testimony began with an explanation of the "problems in Kenosha" that had been mentioned in his statement introduced at trial. Defendant stated that, in 1995, he was living in Kenosha with Lyda. At that time, defendant was selling drugs. In early November 1995, defendant paged a man named Fred Jones in order to buy some cocaine. Jones came to defendant's apartment and sold defendant an "eight ball" for $175. Defendant then sold portions of the eight ball to his customers. Defendant's customers complained that the cocaine was bad.

Defendant paged Jones again on November 30, 1995. Jones came to defendant's apartment with another eight ball. Lyda and Hoover also were home at the time. Jones went into the living room and defendant went into the kitchen to get a scale. As defendant was getting the scale, Lyda came running out of the living room toward him with a look of fear on her face. Jones was running behind Lyda trying to grab her. Defendant thought Jones was about to stick him up, so he grabbed Jones, put him in a bear hug, and wrestled him into the living room. Defendant slammed Jones onto the living room floor, and Hoover hit Jones in the head with a golf club. Defendant went back into the kitchen to check on Lyda. When defendant returned to the living room, Hoover was still hitting Jones in the head with a golf club. Defendant put a towel around Jones' neck and strangled him.

When they determined that Jones was dead, defendant and Hoover wrapped his body in blankets with a cable cord and put it into a hall closet. Defendant also took a .357 from Jones' pocket. Defendant, Hoover and Lyda then walked over to Knight's house and Hoover got Knight's car keys. Hoover and defendant put Jones' body into the trunk of Knight's car. Defendant, Hoover and Lyda then drove from Kenosha to Chicago, stopping at a grocery store to buy lighter fluid.

Hoover and defendant agreed that they had to get rid of Jones' body and that the best way to get rid of it would be to burn it. They drove to an alley, where defendant and Hoover poured lighter fluid on the blankets and the body and then lit the lighter fluid. Defendant guessed it was after midnight on December 1, 1995, at this point. Hoover, defendant and Lyda then drove back to Kenosha and picked up Knight. The next morning, Knight drove Hoover, defendant and Lyda back to Illinois.

Defendant stated that it was Hoover who suggested that they rob a bank. Before they found a bank to rob, they got off an expressway onto Garfield Avenue and saw Ervin Shorter's car at a Kentucky Fried Chicken restaurant. Defendant claimed that Hoover, not defendant, suggested that the car's owner could be a highly paid drug dealer and would be easier to rob than a bank. Hoover got out of the car and pointed his gun in the driver's side window of Shorter's car. Shorter moved over, so Hoover went over to the passenger's side and got in while Knight got into the driver's side of the car. Defendant then got into the backseat and took the .357 from Hoover. Hoover asked Shorter to give him the "dope" and the money. Shorter replied that he did not have any money or dope.

Defendant also claimed that it was Hoover's idea to kill Shorter. Defendant said that when they stopped in the alley where Shorter's body was found, Hoover grabbed the .357, opened the trunk and ordered Shorter out. Defendant knew Hoover planned to kill Shorter, so he closed the trunk of the car, walked around to the front of the car, and told Hoover that he was not going to have anything to do with the shooting. Defendant got into the driver's seat of the car and waited for Hoover. While he was waiting, he heard two shots. Hoover then got into the passenger's side and they drove off. Defendant drove for a short time and then pulled the car over. At that point, Hoover got out of Shorter's car and Knight got in.

Defendant admitted that he dropped the .357 and Shorter's car keys while the police were chasing him.

Defendant denied shooting Shorter and claimed that he had lied when he confessed in his statement to being the shooter. Defendant explained that when he learned his wife was in custody, he asked a detective if there was anything defendant could do to ensure that his wife would go free. The detective did not promise defendant anything, but told defendant the officers would have to see how the story went. Defendant said he told the officers about the incident in Kenosha, but did not mention Hoover at first. Defendant told the officers that he had killed Fred Jones and also told them that Knight, not Hoover, helped him carry Jones' body out of the apartment. Defendant said that he did not mention Hoover at first because he thought Hoover could take care of Lyda while defendant was in prison. Defendant also lied to police when he told them that he made Lyda watch him beat Fred Jones to death and that he told Lyda she would be next if she said anything to the police. Defendant said that he initially ran from Officers Lott and Lopresti because he wanted to throw away the gun and the car keys.

At the close of trial, the jury found defendant guilty of first degree murder, aggravated vehicular hijacking, and aggravated kidnapping. At the subsequent death penalty hearing, the same jury found the defendant eligible for the death penalty based on his having committed murder during the course of another felony (720 ILCS 5/9—1(b)(6) (West 2000)). The jury also found that there was no factor in mitigation sufficient to preclude the imposition of the death penalty and defendant was sentenced to death for the murder of Ervin Shorter. Defendant also was sentenced to consecutive prison terms for aggravated vehicular hijacking and aggravated kidnapping. Defendant now appeals his convictions and

sentences, claiming numerous pretrial, trial and sentencing errors.

## ANALYSIS

### Motion to Suppress

Defendant's first issue on appeal is that the trial court erred in denying defendant's motion to quash his arrest, to suppress the evidence recovered along the route of the chase, and to suppress his statement to police which was introduced at trial. We first review the circumstances under which defendant made the statement. We then consider the testimony presented at the suppression hearing.

Defendant was interviewed four times at the police station by Detective David Ryan and Officer Thomas Keane. During each interview, defendant stated that he understood his *Miranda* rights and was waiving them.

The notes of Detective Ryan and Officer Keane revealed that defendant's first interview took place at 2:10 p.m. on December 2, 1995. Defendant stated that he lived in Kenosha, Wisconsin, with his wife, Lyda Antia, and sold drugs for a living. On November 30, 1995, he killed Fred, a drug dealer, because Fred had sold him some bad drugs. Defendant had sold those drugs to his customers, and his customers complained. Defendant choked Fred and beat him to death at defendant's apartment. Defendant forced Lyda to watch the beating and told her that he would kill her if she said anything. Later, defendant burned Fred's body somewhere on the west side of Chicago. Although Fred had a gun, Fred never pulled the gun on defendant. Defendant took Fred's gun.

Defendant said that on December 2, 1995, he, Lyda, Knight and Hoover were driving in Chicago when defendant saw a newer Chevy Impala in a restaurant parking lot near the Garfield Avenue exit to the Dan Ryan expressway. Defendant forced the owner of the

Impala, Ervin Shorter, to move to the passenger side of the car. Knight drove the Impala while defendant rode in the back. Defendant instructed Lyda to follow in Knight's car. They drove to the area around Belmont Avenue, where defendant spotted some banks that he wanted to check out in more detail. At some point, defendant put Shorter in the trunk of the Impala. Defendant and Knight drove around looking for a spot to kill Shorter. They forced Shorter to get out of the trunk. Defendant ordered Shorter to kneel. Shorter pleaded for his life and covered his face. Defendant shot him twice. Defendant and Knight got back into the Impala, with defendant driving.

Defendant's second interview took place at 3 p.m. on December 2, 1995. In that interview, defendant gave further details concerning the murder of Fred in Kenosha. Defendant said that he used a four iron golf club to beat Fred. He then took $200 from Fred's body, tied his body with a cable and wrapped it in a blanket. Lyda called Knight to the apartment to help defendant remove the body. Defendant bought two cans of lighter fluid, opened the blanket, and sprayed the fluid directly on the body. Defendant then set the body on fire and threw the cans of lighter fluid on the roof of a nearby school building.

Following Fred's murder, defendant wanted to rob a bank so he would have money to go to Atlanta, where an uncle lived. Lyda was given the job of "casing" the bank. Knight would help and would share in the proceeds of the robbery. They saw a banner on a bank indicating that the bank would open at 8 a.m. Meanwhile, defendant wanted to kill Shorter. Defendant and Knight were driving in the Impala. They pulled into an alley and forced Shorter out of the trunk. Shorter pleaded for his life. Defendant shot Shorter twice. Defendant also told Knight to shoot Shorter because defendant did not want the

only bullets in Shorter's body to be from defendant's gun. Knight, however, did not fire his gun.

The third interview of defendant took place at 7 p.m. on December 2. In this interview, defendant stated that Brian Hoover was with Lyda and defendant when they burned Fred's body, and said that Hoover had taken the money from Fred's body. Hoover used some of Fred's money to buy the lighter fluid. Hoover also was along during Shorter's kidnapping and murder. Defendant had not told the officers of Hoover's role in the events because he wanted Hoover to remain free to take care of Lyda.

The fourth interview of defendant took place at 8:35 p.m. In this interview, defendant detailed the group's intention to rob Shorter and use his car in a bank robbery. Defendant also detailed the roles that Lyda, Knight and Hoover were to play in the bank robbery. While they were waiting for the bank to open, defendant told Hoover and Knight that he needed to find a spot to get rid of Shorter. They drove to one alley, then to another. Defendant forced Shorter out of the trunk. Shorter pleaded for his life as he knelt on the ground. Defendant shot Shorter twice. Defendant drove away in the Impala with Knight. Defendant parked the Impala because they had planned to use Knight's car to case the bank.

In addition to his interviews with Detective Ryan and Officer Keane, defendant also spoke with Assistant State's Attorney Steven DiNolfo. DiNolfo first met with defendant around 10 p.m. on December 2, 1995. DiNolfo advised defendant of his *Miranda* rights, and defendant stated he understood those rights. Defendant then agreed to talk to DiNolfo about the shooting of Ervin Shorter. Defendant spoke with DiNolfo for around 25 to 30 minutes.

DiNolfo interviewed defendant a second time around 12:15 a.m. on December 3, 1995. Prior to this second interview, DiNolfo again advised defendant of his

*Miranda* rights. DiNolfo spoke with defendant for approximately 20 minutes. At the conclusion of this interview, defendant chose to have DiNolfo prepare a handwritten statement. DiNolfo prepared the handwritten statement around 12:45 a.m. Defendant initialed each page of the statement and made corrections to the statement. As noted, this statement was introduced into evidence at trial.

The circuit court held a hearing on defendant's motion to suppress. At the hearing on defendant's motion to suppress, Officer Lotts testified that on Saturday, December 2, 1995, he and Lopresti were wearing uniforms and were in a marked squad car. Lotts said that when defendant and Knight were crossing Paulina, they looked and made eye contact with the officers. Lotts testified that the men had a look of surprise, shock and fear when they made eye contact with him.

When the officers saw defendant and Knight begin running, they parked their squad car and pursued them. Lotts testified that he knew the area had a problem with auto theft, so when he saw the men run into the alley, he believed there was a possibility that the Impala was stolen. At that point, however, Lotts had no information that the car in fact had been stolen.

Lotts temporarily lost sight of the men, but surmised that they had jumped a six-foot-high metal fence when he heard the lock on the fence clanging. Lotts looked in the direction of the fence and saw defendant and Knight crouched in the gangway between two homes on School Street. Lotts yelled, "Stop, police." Defendant and Knights made eye contact with Lotts, then continued running northbound through the alley. Lotts again yelled at the men to stop. Because Lotts was separated from defendant and Knight by a six-foot fence, he ran back out of the alley to Paulina, where he met up with Officer Lopresti. The officers got back into their squad car and

saw the men run out of another alley heading westbound toward Henderson. The officers then drove down Henderson. The officers saw a man on the street point toward the direction of 1727 West Henderson. There the officers saw Knight enter a narrow gangway. Lotts and Lopresti got out of the squad car and chased Knight. They were able to apprehend and handcuff Knight.

Lopresti then ran through the backyard of 1727 West Henderson and into an alley, at which point Lotts lost sight of Lopresti. Lotts walked Knight back to Henderson, then radioed for a police car to come and pick up Knight. Lotts ran the license plates on the Impala and, as he was doing so, Lopresti came back to the squad car. Lotts ran the plates around 8:08 a.m.

On cross-examination, Lotts testified that while he was running the plate on the Impala, he was joined by Officer Goldman as well as Officer Lopresti. Officer Goldman said that a citizen had flagged him down because the citizen had seen a hand reaching out from the trunk of a car with the license plate ETM 734. Less than a minute after calling in the license plate, Lotts learned that the owner of the car was Ervin Shorter.

Lotts further testified on cross-examination that prior to the time that he ran the Impala's license plate, he heard over the radio that Officer Hanrahan was being dispatched to the 1800 block of Newport, where a man had been shot. Around 8:10 a.m., Lotts heard Officer Hanrahan radio that he had identified the victim as Ervin Shorter.

Officer Lopresti testified at the hearing on defendant's motion to suppress that, after Knight was handcuffed, he went to an alley in the 1700 block of Henderson looking for defendant. Lopresti met up with Officer Conley. Lopresti and Conley saw defendant hidden behind some garbage cans. Defendant ran out and continued to run even after Lopresti yelled for defendant to stop. Lo-

presti chased defendant but was unable to catch him. Lopresti then saw defendant hiding under some debris in a garage at 1753 West School Street. Prior to seeing defendant hiding under the debris, Lopresti had not received any information about any crimes committed in the vicinity, had not received any information regarding the Impala, and had not received any information concerning defendant. Lopresti and another officer pulled defendant from the debris and placed him in handcuffs. Lopresti explained that he was detaining defendant to determine why he had been running from the police. Lopresti said there had been a high number of garage burglaries and auto theft in the area. In addition, when defendant and Knight first saw the officers, they looked at the officers very suspiciously with fear in their eyes and did not stop when ordered to do so. Lopresti explained that the neighborhood where the activities took place was a residential, primarily white neighborhood. Defendant ultimately was detained around 7:50 a.m.

On cross-examination, Lopresti testified that immediately after defendant was detained, he heard the dispatcher call Officer Hanrahan with a report of a person shot in the alley at 1830 West Newport. 1830 West Newport is approximately 2 to $2^{1/2}$ blocks from where the chase of defendant had started. Around two minutes later, Lopresti heard Officer Hanrahan over the radio report that the shooting victim was deceased. At 8:10 a.m., Lopresti heard over the radio that the Impala was registered to Ervin Shorter. Lopresti also heard Officer Hanrahan over the radio respond that Ervin Shorter was the victim that he had in the alley.

Following the hearing, the trial court made its findings of fact and conclusions of law. The trial court found that defendant had been taken into custody at 7:52 a.m. on December 2, 1995. The trial court further found that neither officer had knowledge of a particular offense dur-

ing the chase or apprehension of defendant, nor was the apprehension of defendant based upon a search warrant, arrest warrant or any other legal process. At 8:01 a.m., the officers learned that the Impala was registered to Ervin Shorter. At 8:06 a.m., Officer Goldman told Officer Lotts that a citizen had seen a person's hand coming out of the trunk of an Impala with license plate number ETM 734. Officer Hanrahan was dispatched to a shooting in the 1800 block of west Newport, 2½ blocks from where the Impala had been parked. By 8:10 a.m., Officers Lotts and Lopresti learned that the victim in the shooting was Ervin Shorter.

Based upon the foregoing facts, the trial court found that the stop of defendant was a *Terry* stop. The trial court further held that there was a sufficient basis for the stop, given the officers' knowledge of the area and their observations of defendant and Knight prior to their detention. The trial court also held that even if it were to find that defendant was subject to a full custodial arrest at the time he was placed in handcuffs, there was a sufficient intervening factor which provided a basis to arrest defendant and Knight.

With regard to the trial court's ruling, defendant argues that his confession should have been suppressed because his detention was an arrest, not a *Terry* stop, and was not supported by probable cause. In the alternative, defendant maintains that even if his detention was a proper *Terry* stop, his detention nonetheless was unlawful because the officers had no reasonable suspicion when they stopped him. Finally, defendant claims that his statements should have been suppressed because they were not sufficiently attenuated from his illegal arrest.

A trial court's ruling on a motion to suppress evidence will be reversed only if that ruling is manifestly erroneous. *People v. Mitchell*, 165 Ill. 2d 211, 230 (1995). However, if neither the facts nor the credibility of wit-

nesses is questioned, *de novo* review is appropriate. *Mitchell*, 165 Ill. 2d at 230. Because defendant does not contest the facts or the credibility of the witnesses, we will review this issue *de novo*.

In support of his claim that the detention was an arrest rather than a *Terry* stop, defendant notes that he was apprehended by multiple officers, was handcuffed, and was placed in a squad car. Defendant maintains that no reasonable person would feel they were free to leave under the circumstances. Defendant further argues that his arrest was without probable cause because at the time of his arrest, the officers had no reason to believe that a crime had been committed in the vicinity or that defendant had committed a crime. Consequently, defendant contends that because he was placed under arrest without probable cause, the fruits of that illegal arrest—his subsequent statements, confession and the items recovered from the chase route—should have been suppressed.

Before this court, the State concedes that defendant's detention was an arrest. The State argues, however, that the physical items recovered from the chase route were not subject to suppression because they were abandoned by defendant during the chase and were not recovered during the stop of defendant. The State further argues that prior to defendant's statement and confession, the police had probable cause, derived from sources independent of defendant's seizure, to seek defendant's indictment. Therefore, defendant's statements were attenuated from his illegal arrest and were properly admitted into evidence.

As a preliminary matter, we address defendant's claim that the trial court should have suppressed the physical evidence recovered along the route of the chase. The United States Supreme Court has considered the issue of whether a court should grant a motion to suppress

evidence thrown away by a defendant shortly before his arrest. See *California v. Hodari D.*, 499 U.S. 621, 113 L. Ed. 2d 690, 111 S. Ct. 1547 (1991).

In *Hodari*, two police officers in an unmarked police car turned a corner and saw four or five youths, including the defendant, huddled around a small red car. *Hodari*, 499 U.S. at 622, 113 L. Ed. 2d at 695, 111 S. Ct. at 1549. The youths panicked and fled at the sight of the officers, causing the officers to give chase. *Hodari*, 499 U.S. at 622-23, 113 L. Ed. 2d at 695, 111 S. Ct. at 1549. Seeing an officer was almost upon him, the defendant tossed away what appeared to be a small rock, later determined to be rock cocaine. *Hodari*, 499 U.S. at 623, 113 L. Ed. 2d at 695, 111 S. Ct. at 1549. The officer then tackled the defendant, handcuffed him, and radioed for assistance. *Hodari*, 499 U.S. at 623, 113 L. Ed. 2d at 695, 111 S. Ct. at 1549.

The California Court of Appeals held that the defendant had been seized when he saw the officer running toward him, that the seizure was unreasonable under the fourth amendment, and that the evidence of cocaine had to be suppressed as the fruit of the illegal seizure. *Hodari*, 499 U.S. at 623, 113 L. Ed. 2d at 695, 111 S. Ct. at 1549. Upon review, the Supreme Court initially held that the defendant had not been seized at the time he dropped the cocaine. *Hodari*, 499 U.S. at 626, 113 L. Ed. 2d at 697, 111 S. Ct. at 1550. The Court noted that an arrest requires either physical force, such as the laying on of hands, or restraint of movement, or in the absence of physical force, submission to an officer's assertion of authority. *Hodari*, 499 U.S. at 626, 113 L. Ed. 2d at 697, 111 S. Ct. at 1550. Because the defendant did not stop when pursued by the officer, he was not seized until the officer tackled him. *Hodari*, 499 U.S. at 629, 113 L. Ed. 2d at 699, 111 S. Ct. at 1552. Consequently, the Court held that the cocaine that was thrown away during the

chase was abandoned prior to the seizure and, thus, was not subject to suppression as the fruit of the illegal seizure. *Hodari*, 499 U.S. at 629, 113 L. Ed. 2d at 699, 111 S. Ct. at 1552.

Here too, defendant and Knight failed to submit to the officers' show of authority and requests to halt. Defendant was not seized until Officer Lopresti pulled him out of the debris and placed him in handcuffs. This seizure occurred after defendant had abandoned the physical evidence along the chase route. Accordingly, as in *Hodari*, the evidence recovered along the chase route could not have been the fruit of an illegal arrest. The trial court, therefore, properly denied defendant's motion to suppress that evidence.

Having found that the trial court properly denied defendant's motion to suppress the physical evidence, we now consider whether the trial court properly denied defendant's motion to suppress his statements and his confession. As noted, the State concedes, and we agree, that defendant's detention constituted an arrest rather than an investigatory *Terry* stop.

Under *Terry v. Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968), which has been incorporated into our criminal code (see 725 ILCS 5/107—14 (West 1994)), law enforcement officers may detain and question individuals under certain circumstances where probable cause to arrest is lacking. However, the investigative detention must be temporary and must last no longer than necessary to effectuate the purpose of the stop. *People v. Brownlee*, 186 Ill. 2d 501, 519 (1999). Consistent with *Terry*, unprovoked flight from police officers may support a finding of reasonable suspicion to stop an individual and investigate further. *Illinois v. Wardlow*, 528 U.S. 119, 124-25, 145 L. Ed. 2d 570, 576-77, 120 S. Ct. 673, 676 (2000). If the officer does not learn facts rising to the level of probable cause, he must allow the detained

individual to go on his way. *Wardlow*, 528 U.S. at 126, 145 L. Ed. 2d at 577, 120 S. Ct. at 677.

The officers' initial decision to pursue defendant was justified under *Wardlow*. Once Lopresti pulled defendant from the debris, however, he did not question defendant, nor did he detain defendant while he investigated further. Rather, he handcuffed defendant and had other officers transport him to the police station in a squad car. In doing so, Lopresti exceeded the bounds of an investigatory stop. See *Florida v. Royer*, 460 U.S. 491, 501, 75 L. Ed. 2d 229, 239, 103 S. Ct. 1319, 1326 (1983) (proper investigatory stop evolved into more serious intrusion on defendant's personal liberty when detectives moved defendant from airport concourse to interrogation room approximately 40 feet away). As a practical matter, once defendant was handcuffed and transported to the police station, he was under arrest.

Our inquiry, however, does not end there. The determination that an illegal arrest has occurred does not resolve the question of whether a defendant's confession is admissible. *People v. Foskey*, 136 Ill. 2d 66, 85 (1990). Rather, the relevant inquiry is whether the confession was obtained by exploitation of the illegal arrest or was obtained " 'by means sufficiently distinguishable to be purged of the primary taint' " of the illegal arrest. *Wong Sun v. United States*, 371 U.S. 471, 488, 9 L. Ed. 2d 441, 455, 83 S. Ct. 407, 417 (1963), quoting Maguire, Evidence of Guilt 221 (1959). Factors to be considered in determining whether a confession was the product of an illegal arrest include: (1) the proximity in time between the arrest and the confession; (2) the presence of intervening circumstances; (3) the purpose and flagrancy of the police misconduct; and (4) whether *Miranda* warnings were given. *Foskey*, 136 Ill. 2d at 85-86, citing *Brown v. Illinois*, 422 U.S. 590, 603-04, 45 L. Ed. 2d 416, 427, 95 S. Ct. 2254, 2261-62 (1975). The

burden of showing the admissibility of the statement rests on the prosecution. *Brown*, 422 U.S. at 604, 45 L. Ed. 2d at 427, 95 S. Ct. at 2262.

Here, there is no question that defendant was given his *Miranda* warnings prior to giving each of his statements and his confession. Although this is a factor to be considered, however, the fact that *Miranda* warnings were given is not sufficient in itself to purge the taint of illegality. *Foskey*, 136 Ill. 2d at 86.

With regard to intervening circumstances, the State argues that the presence of intervening probable cause weighs in favor of finding that defendant's confession was attenuated from his illegal arrest. We agree.

The presence of intervening probable cause does not assure in every case that an illegal arrest has not been unduly exploited. See *People v. Ornelas*, 295 Ill. App. 3d 1037, 1045 (1998); *People v. Pierson*, 166 Ill. App. 3d 558, 564 (1988), citing *United States v. Cherry*, 759 F.2d 1196, 1212 (5th Cir. 1985). However, it is an important factor in the attenuation analysis. See *Ornelas*, 295 Ill. App. 3d at 1045; *Pierson*, 166 Ill. App. 3d at 564. Here, the development of intervening probable cause occurred almost simultaneously with defendant's illegal detention. Just prior to the time that Officers Lotts and Lopresti noticed and began their pursuit of Knight and defendant, Judith Dean observed a hand sticking out of the trunk of a car with the license plate ETM 734 and called 911. While the officers were pursuing defendant and Knight, Officer Hanrahan was dispatched to an alley where he discovered the body of Ervin Shorter, killed so recently that steam was coming from his head where he had been sweating. Before Officer Lopresti returned from his pursuit of defendant, Officer Lotts had called in the license plate of the Impala. Lotts was joined by Officer Goldman, who told him that a citizen had reported seeing a hand reaching out from the trunk of a car with the

same license plate as the Impala. Defendant was arrested before information came back on the plate's registration. Shortly thereafter, Lotts learned that the plate was registered to Ervin Shorter and that Shorter was the victim discovered by Hanrahan.

At this point, the officers had probable cause to connect defendant with the murder of Ervin Shorter. Probable cause exists where the totality of circumstances and facts known to officers is such that a reasonably prudent person would believe that the suspect is committing or has committed a crime. *People v. Montgomery*, 112 Ill. 2d 517, 525 (1986). The information giving rise to probable cause was obtained independently of defendant's illegal arrest. Indeed, all of the information other than confirmation concerning the registration of the Impala was obtained prior to defendant's illegal arrest and well before defendant's first statement in this case.

Had the officers decided at this time that defendant's initial detention was illegal, they could have released him and then, based upon the probable cause that developed independently of his initial arrest, immediately arrested him again. Under this scenario, there would be no question that defendant's statements and confession would be admissible. It follows, then, that the probable cause that would support a second arrest only minutes after defendant's first arrest also serves to break the causal connection between defendant's first illegal arrest and the statements defendant gave six hours later. As our appellate court has noted, it would place an unreasonable burden on the police to require officers to release an illegally arrested defendant and then, based upon probable cause obtained after the illegal arrest, arrest him again when he reached the sidewalk. See *People v. Berry*, 314 Ill. App. 3d 1, 17 (2000); *People v. Wright*, 294 Ill. App. 3d 606, 613 (1998); *People v. Lekas*, 155 Ill. App. 3d 391, 414 (1987). In the case at bar, the probable cause to ar-

rest defendant for the murder of Ervin Shorter developed independently of defendant's illegal arrest. Moreover, that independent probable cause arose only minutes after defendant's arrest. This is not a case, therefore, where the police illegally arrested an individual and then, during the time of the illegal detention, went out and developed probable cause to support the arrest. *Cf. Cherry*, 759 F.2d at 1212. Accordingly, under the circumstances of this case, the development of independent probable cause weighs heavily in favor of finding that the taint of defendant's illegal arrest had been purged prior to the time he gave his statements to the police.

The next factor we consider is the proximity in time between defendant's illegal arrest and confession. This court has recognized that the temporal proximity between an arrest and a confession often is an ambiguous factor, the significance of which will depend upon the circumstances of each particular case. *People v. White*, 117 Ill. 2d 194, 223-24 (1987). For example, on the one hand, in the absence of intervening circumstances, "a long and illegal detention may in itself impel the defendant to confess" and, thus, may constitute a serious exploitation of an illegal arrest. *White*, 117 Ill. 2d at 224. On the other hand, a lengthy period of detention may be viewed as helping "to purge the taint of a prior illegality by allowing an accused to reflect on his situation, particularly when attended by other factors ameliorating coercion, such as *Miranda* warnings." *Lekas*, 155 Ill. App. 3d at 414.

In the case at bar, defendant was illegally arrested at approximately 7:50 a.m. Probable cause to detain defendant developed independently of any illegal police action only minutes later. Defendant was first interviewed at 2:10 p.m., approximately six hours after probable cause to arrest defendant had developed. He was also interviewed at 3 p.m., 7 p.m., 8:35 p.m. and 10 p.m. on

December 2, 1995, and at 12 a.m. on December 3, 1995. As noted, probable cause to detain defendant developed independently of any illegal police action only minutes after defendant's arrest. Thus, while defendant was illegally detained for a few minutes, he was immediately thereafter in lawful custody. Approximately six hours of lawful custody then passed before defendant gave his first statement to the police. Therefore, under the facts at bar, to the extent that the passage of time itself impelled defendant's confession, that passage of time—since it was almost entirely during a period of lawful custody—must be viewed as a factor which weighs in favor of finding that the illegality of defendant's arrest had been purged by the time he gave his statements to the police.

The final factor in determining whether defendant's statements and confession were admissible is the purpose and flagrancy of the police conduct. Defendant argues that the police conduct here was flagrant because his illegal arrest was undertaken as a "fishing expedition" in the hopes that detaining defendant would yield evidence of a crime.

Although defendant is correct that illegal arrests have been held to be purposeful and flagrant when undertaken solely to conduct "fishing expeditions" (see *Brown v. Illinois*, 422 U.S. 590, 45 L. Ed. 2d 416, 95 S. Ct. 2254 (1975)), this is not such a case. In *Brown*, flagrant police conduct was found where the defendant's arrest was undertaken for investigation and without any probable cause, in the hope that something might turn up, and was effected in a manner calculated to cause fright, surprise and confusion. *Brown*, 422 U.S. at 605, 45 L. Ed. 2d at 428, 95 S. Ct. at 2262.

Here, in contrast, the evidence does not show that the police were acting upon such an absence of probable cause as to render entirely unreasonable any belief that

probable cause existed. The officers' initial pursuit and detention of defendant fell within the parameters of *Wardlow*. That detention exceeded the bounds of a proper investigatory stop only when defendant was handcuffed and transported to the police station. At that point, however, intervening probable cause had developed. Consequently, there is no evidence that defendant's subsequent statements and confession were the result of flagrant police misconduct.

Considering the totality of the circumstances, we find that the taint of defendant's illegal arrest had been purged by the time he gave his statements to the police. Defendant's statements and confession thus were not the fruit of his illegal arrest but instead were attenuated from that illegal arrest. We therefore affirm the trial court's order denying defendant's motion to suppress.

### Ineffective Assistance of Counsel

Defendant contends that he was denied the effective assistance of counsel. Defendant maintains that his trial counsel mistakenly discussed the murder of Fred Jones in her opening statement to the jury and subsequently allowed defendant to testify concerning the murder of Fred Jones, even though the trial court had agreed to exclude that evidence from trial. The following facts are relevant to the disposition of this issue.

Prior to trial, defense counsel filed a "Motion To Bar Use Of Immaterial, Incompetent Prejudicial Evidence" and a "Motion To Bar Use Of Uncharged Crimes Evidence." In the motion to bar use of immaterial, incompetent prejudicial evidence, counsel alleged that Assistant State's Attorney DiNolfo gratuitously included certain immaterial and prejudicial statements in the confession that he transcribed. The statements in question were that defendant lived in Kenosha, Wisconsin; defendant noticed some damage to the trunk of Shorter's car, indicative of an attempt by Shorter to escape; defendant and

Knight jumped out of Shorter's car and ran away; defendant left the .357 Magnum and the keys to Shorter's car in the alley; defendant killed Shorter because Shorter saw what defendant looked like; and Shorter cooperated with defendant and did not struggle with him in any way. Defense counsel requested that the trial court redact the statements from the confession.

In the motion to bar use of uncharged crimes evidence, defense counsel alleged that the confession transcribed by DiNolfo contained material extraneous to the crimes charged in the indictment. Counsel claimed that the material was highly prejudicial since "it purports to be the thought processes of Richard Morris relating to another, uncharged crime, namely the robbery of an undetermined bank in Chicago." Defense counsel requested that the portions of the confession relating to the robbery be redacted. Counsel did not reference the murder of Fred Jones in Wisconsin or make any request regarding Jones' murder. After a hearing, the trial court denied both motions. Defense counsel filed no other motions *in limine*.

At a later hearing, as defense counsel sought to convince the court to ask potential jurors whether they would automatically impose the death penalty if they decided defendant had committed two murders, counsel informed the court that the question was necessary because the court had ruled that evidence of the Jones murder would be admissible. This colloquy followed:

"THE COURT: What have I ruled?

[Defense Counsel]:You have ruled that the Kenosha murder may come in.

THE COURT: Where did you get that?

[Defense Counsel]: I had a motion to bar any mention of the Kenosha case, Judge. You denied that motion.

THE COURT: No, I didn't. I granted that same motion for Judy Stewart [codefendant Knight's counsel] today. You never asked me to do that. You gave me a statement to

read, and I said that the reasons he said in the statement of why he was coming to Chicago could come in, but there was nothing about a second murder in there.

[Defense Counsel]: Judge, there was a separate motion to bar the use of uncharged crimes evidence. You denied that motion. I had a separate motion to bar the use of uncharged crimes, which was the Kenosha murder. You denied that motion as to me.

THE COURT: That may be sometime ago. I don't remember that at all. What about that? Did I do that? That is obviously not going to come in at the guilt or innocence stage.

[Defense Counsel]: Judge, that is the motion that is titled, 'Motion to Bar Use of Uncharged Crimes Evidence.' You denied that on the last court date.

THE COURT: That would be at the sentencing phase.

[Defense Counsel]: We were talking at the guilt and innocence phase.

THE COURT: I don't believe so.

[Prosecutor]: The Motion to Bar Use of Uncharged Crimes Evidence, which the Court denied on November 16th of 1998, was referenced regarding Exhibit A, which was the handwritten statement of Mr. Morris. The conduct in that handwritten statement does not describe the events regarding the murder in Kenosha, Wisconsin. It describes the events leading up to and including the murder of Ervin Shorter here in Chicago.

[Defense Counsel]: That was a separate motion. That was a motion to bar the use of immaterial, incompetent, prejudicial evidence. That was a separate motion, Judge.

THE COURT: The way I recall, they both said the same thing. It is not my intention to let in the Wisconsin killing, not at all. I didn't have that impression that that was the thrust of your motion.

[Defense Counsel]: Well, I am glad we cleared that up.

THE COURT: [Pardon] me?

[Defense Counsel]: I am glad we cleared that up.

THE COURT: I am glad you did."

Despite this exchange, when the trial began eight days later on December 1, 1998, defense counsel discussed

the murder of Fred Jones in her opening statement to the jury in considerable detail:

"[Defense Counsel]: Ladies and gentlemen, [the prosecutor] just told you that the evidence will show Tywon Knight and Richard Morris guilty. But you don't have Tywon Knight to judge. You don't have Lyda Antia to judge. You don't have Brian Hoover to judge. You are called here today and in the days to come to render a judgment on this man and this man alone. This is Richard Morris. You are called here today and in the days to come to measure his legal, his moral responsibility for what occurred on December 2nd of 1995. You are called here today and finally in your deliberations to determine the degree of his responsibility for what happened to Ervin Shorter. And when you do that, in the process of that, you will learn some things. You will learn them from the evidence. You will learn that Richard Morris did not shoot Ervin Shorter. You will learn that from this witness box. Because Richard Morris will tell you that himself.

How did we get to that point, [the prosecutor] asked you. How did we get to the point where Richard Morris will sit in that witness box and tell you what happened? He mentioned to you that Mr. Morris had some problems in Kenosha. Ladies and gentlemen, [the prosecutor] didn't tell it all to you. \*\*\* Three people at a minimum had a very serious problem on the morning of December 2, 1995 and probably a fourth one as well. Who had that problem? You have heard mention of Lyda Antia Morris, L-y-d-a. That is Richard Morris' wife. You are going to hear that they had been married for some years, legally married. And that is an important fact, the relationship between Mr. Morris and his legal wife, the woman he loved. You are going to hear about Brian Hoover who is not here before you. You are going to hear that he had a nickname. His nickname was Taz just like the Tazmanian main [*sic*] Devil. You are going to hear about Tywon Knight who is seated here before you. You are going to hear that Richard Morris' family and friends know him as Peanut. Among the people that Richard Morris knew when he was growing up was a man by the name of Fred Jones. You have not heard his name yet. I will tell you now that Fred Jones is an

important person in what happened here in Chicago although he died violently in Kenosha on November 30.

\* \* \*

On November 30 of 1995—well, let me go back even to August of 1995. Richard Morris, Peanut, had known Fred Jones when he was younger. He had not been in his old neighborhood for sometime. He will tell you that he went to a video store and he got reacquainted with Fred Jones. And Fred Jones told Peanut that he was on his feet. \*\*\* But in that conversation between Peanut and Fred Jones it meant one thing. I am now selling weight. Richard Morris will tell you what weight is. And he will tell you that he was interested in someone who could sell him weight of cocaine so that he could cut that weight into bags and sell it to customers on the street. You will hear him describe for you and there will be no dispute from the police that a baller is a dope dealer. \*\*\* You are going to hear from Richard Morris that he did in fact purchase some drugs from Fred Jones shortly before November 30, 1995. He cut them. You are going to hear about a scale in his apartment. Remember he is not on trial here because he is a drug dealer. But you are going to hear him describe this process to you. And he took those drugs and sold them to customers on the street and something unusual happened. Peanut's customers were not happy with him. And he had to refund some of their money because the rocks they got from him—we are talking about rock cocaine—was bad.

Now, along about this time—and you are going to hear Peanut and Lyda had an apartment in Kenosha. Along about this time, someone who is a friend of Lyda's and casually known to Peanut came into their life and started staying with them and had been staying with them for a few days. And that person is Taz. And Peanut and Taz and Lyda talked about this drug business. And Peanut paged Fred Jones to come to his apartment in Kenosha on November 30 of 1995. We are talking a period of time roughly thirty-six hours before Ervin Shorter would die violently in that alley behind Cornelia Street.

You are going to hear Richard Morris tell you that when Fred Jones came to that apartment, he was wary. He was

wary because Fred'had sold him bad drugs. He was wary because he knew that Fred carried a gun. And in fact, Fred was armed that night. And he didn't know what was up with Fred. But he had a situation he felt he had to deal with. You are going to hear that when Fred came to that apartment, the apartment that he came into was shaped sort of like a U. On one side of the U was a living room. On the other side of the U so to speak was a kitchen. When Fred came in that apartment he went into the living room area. In the living room area were Taz and Lyda. Peanut went to the kitchen to get the scale. Before he went to get the scale, he saw the drugs that Fred had brought because when Fred was paged. [sic] He brought drugs with him. And he will tell you what he thought when he saw the packaging of the drugs that Fred brought with him. He went to the kitchen to get the scale. And the next thing he knew his wife came running out of the living room into the kitchen and right behind her was Fred. He, Richard Morris, had no idea what had happened in there. But he will tell you and [the prosecutor] mentioned the look on Mr. Morris' face when he saw the police, he will tell you the look on his wife's face as she ran in front of Fred Jones. And then as he told the police when he was questioned by them on December 2 and December 3 what happened next happened too fast to stop it.

* * *

And what happened, next ladies and gentlemen, was a vicious beating, vicious beating involving a four iron golf club and strangulation involving a towel. There was blood everywhere. You are going to hear about cleaning up walls, plastic bags over the head to prevent the mess from getting any bigger. The mess from snuffing out a human life. You are going to hear that after all of this happened, Peanut himself recovered from Fred's body a .357. And that gun, that .357 is the same gun that roughly thirty-six hours later killed Ervin Shorter. And you are going to hear more about that gun. You are going to hear from Richard Morris how Taz also went through the pockets of Fred Jones and money was found and other items that you are going to be hearing about. In a very ironic twist, the money,

Fred Jones' money[,] was used in a very barbaric way against him after he was dead. And you are going to hear about that. Now, Peanut did not have a car. Lyda did not have a car. Taz had just gotten out of prison. He did not have a car. They had among the three of them, they had a mutual acquaintance named Tywon Knight who is here before you today. And you are going to hear how they went to Tywon Knight for the purpose of borrowing his car. Then Taz, Lyda and Richard Morris drove to Chicago. You are going to hear how they removed the body. They put the body into the trunk and they drove down to Chicago. You are also going to hear, ladies and gentlemen, that of these three people, Lyda Antia, Taz and Peanut, one of them was not familiar with the Chicago area. You are going to hear that Lyda Antia had family here. And in fact Lyda Antia's family played some part in the arrest of Lyda Antia. You are going to hear that Taz had lived here for sometime. Of the three of them, only Richard Morris was not familiar with this area. They came to Chicago. They came to the west side. You are going to hear that Richard Morris, Taz, and Lyda bought lighter fluid and they bought it I am sad to say with Fred Jones' own money. They took the lighter fluid. They drove to an alley. The body in the trunk. When they got to the alley, you are going to hear that that lighter fluid was put not only on the outside blanket covering Mr. Jones but also that the blanket was peeled back and actually poured onto his body and then the body was set on fire early in the morning hours in an alley on the west side of Chicago.

The cans were thrown up on to the roof of a nearby school and you are going to hear that fingerprints were recovered from those cans, the fingerprints of Richard Morris and the fingerprints of Taz. Having done all of this, Taz, Peanut, and Lyda got into the car and went back to Kenosha. *** It was now December 1, 1995, three years ago today. Peanut turned 25 on that day. And you are going to hear from him about the use of drugs. You are going to hear about something called blunts, which is marijuana that is the middle part of a cigar is taken out and marijuana is substituted for it. And you are also going to hear there was some drinking of a French brandy called Alize. That

went on [*sic*] off and on during the course of the day during the night of the 1st into the early morning hours of the morning when Mr. Shorter was shot."

In the balance of her opening statement, counsel told the jury that defendant, Taz, Lyda and Knight obtained a second gun in University Park and made plans to rob a bank in Chicago:

"[Defense Counsel]: You are going to hear that Peanut decided he needed some money and he needed to get away. You are going to hear that the subject of bank robberies came up. You are going to hear that at every step of the way [*sic*] every step of the way from the minute Richard Morris left Kenosha up until the minute that he drove away in Mr. Shorter's car after Mr. Shorter was dead, at every step of the way it was Peanut, Taz, Lyda and Mr. Knight. But not all of them did the same thing. And it's your determination on the moral responsibility of Mr. Morris that is at issue in this case.

[Prosecutor]: Judge, I am going to object. Misstatement of the law.

THE COURT: Sustained. Moral responsibility is not involved here. Legal responsibility is."

Defense counsel then detailed the circumstances of Ervin Shorter's kidnapping and the hijacking of Shorter's car. Counsel readily admitted that defendant participated in the kidnapping and hijacking. Counsel also detailed the circumstances of Shorter's murder and defendant's arrest. She admitted that defendant was in the alley at the time of the shooting, but claimed that Hoover shot Shorter. Lastly, counsel informed the jury that defendant had been convicted of other felonies and had attempted escape. She concluded:

"You are going to hear from police officers who are going to tell you he did not want to get arrested and he did everything he could to escape. And you are going to hear that is not the first time in his life he [has] done that. You are going to hear he has been convicted of running from the police when they are trying to arrest him. Actually felony convictions. And of course you are going to hear

about the felony convictions for stealing a car, possession of a weapon were the reasons the police were trying to arrest him.

You are going to see at the close of all the evidence that there is more and there is less than what [the prosecutor] told you. After you have considered everything, I am confident that you will know where to attach responsibility and what degree of responsibility to attach to Mr. Morris."

At the conclusion of opening statements, the following discussion took place outside of the presence of the jury:

"[Prosecutor]: Briefly, Judge. Frankly I am not certain how to approach this. But clearly in [defense counsel's] opening statement in front of the Morris jury, [defense counsel] alluded to several matters that Mr. Morris moved in limine to prevent the trier of fact from hearing before we picked this jury several weeks ago. Especially the murder of Fred Jones, drug activity in the state of Wisconsin, the concealment of Mr. Jones' body here in Chicago, the setting him on fire. All of these matters the defendant moved in limine to keep out. And apparently [defense counsel] perhaps violated her own motion in limine by mentioning these things in opening statement. We were under the impression we weren't going to get into this evidence. We learned about all this evidence in front of the Morris jury by way of the defendant's opening statement. It appears obviously to be a matter of trial strategy. And I am curious as to whether or not your Honor would be interested in asking Mr. Morris if he agrees with the trial strategy in the opening statement given by [defense counsel].

[Defense Counsel]: Judge, can I respond just briefly?

THE COURT: Sure.

[Defense Counsel]: It's my understanding of the Court's ruling that the matters would not—the State would not be allowed to bring them up in their case in chief. But that they might be matters that could be brought up in rebuttal.

THE COURT: Well, I think what we were talking about in particular was what was set forth in Mr. Morris' statement. And that I was not going to redact things from the

statement that, you know, he would live with whatever he purportedly said.

[Defense Counsel]: Judge, I had two separate motions. When we had this very conversation, I mentioned to your Honor that what I thought I was asking you was exactly what Ms. Stewart [codefendant Knight's counsel] was asking on different grounds because Mr. Morris is not in the same posture as Mr. Knight. But that I was asking for it not to be admitted period. And your Honor's response was that it would not be allowed in the State's case in chief. You did not rule it out in rebuttal. So my understanding was it could come in anyway.

THE COURT: I thought it could come in?

[Defense Counsel]: Yes, that was my understanding, Judge.

THE COURT: Certainly it could come in through the statement of Mr. Morris as to what his intentions were and how his actions in this case corresponded to other criminal matters that were articulated.

[Defense Counsel]: That was how I understood your ruling, Judge.

THE COURT: All right. The fact that you decided to in fact front that information, I suppose that was a matter of trial strategy.

[Defense Counsel]: Well, Judge, what I am saying is I had understood you to say you were not excluding it absolutely.

THE COURT: Okay, fine.

[Prosecutor]: Judge, if I may still renew our request. And if the Court will forgive me. I have not read People [vs.] Hattery for sometime but in the back of my mind I seem to recall a similar scenario about literally in opening statement giving a statement that in essence inculpates your own client and the inquiry of whether or not that was done with the defendant's intent and that it's his desire. I am sure the Court will recall it better than I do but that is my reaction upon hearing that."

At the State's request, the judge then asked defendant himself if he had "any problem" with his attorney's opening statement. Defendant replied that he did not.

The trial then continued with the presentation of the

State's case in chief, followed by the presentation of the defense. As noted, defendant testified regarding the circumstances of the murder of both Fred Jones and Ervin Shorter. At the conclusion of his testimony on direct examination, defendant was cross-examined by the State at length regarding the murder of Fred Jones:

"[Prosecutor]: Mr. Morris, would it be fair to say that the story you've told us today makes you guilty of a murder?

[Defense Counsel]: Objection, Your Honor.

THE COURT: Sustained.

[Prosecutor]: Sir, would it be fair to say that you told us you killed Fred Jones?

[Defense Counsel]: Objection.

THE COURT: Overruled.

THE WITNESS: Correct.

[Prosecutor]: So you are guilty of murder, correct?

[Defense Counsel]: Objection.

THE COURT: Sustained.

[Prosecutor]: You intentionally took that towel and put it around his neck, right?

A. Correct.

Q. You intentionally twisted that towel, right?

A. Correct.

Q. You looked down in his eyes when you did that, sir, right?

A. Incorrect.

Q. You didn't look at him when you killed him, sir?

A. No, sir.

Q. Did you look away as you twisted? I can't hear you.

A. Yes, sir.

Q. Did you look away when you put the bag on his head?

A. No, sir.

Q. You had to look at him to bag him, right?

A. Correct.

Q. You tied that bag around his neck, right?

A. Incorrect.

Q. Did you put the bag around his neck loosely?

A. I put the bag over his head, sir.

Q. You put the bag over his head. Did you tie it over his head?

A. It wasn't—no.

Q. You just laid it over his head?

A. Correct.

Q. Did you poke any holes in the bag before you put it over his head?

A. No.

Q. In addition to strangling Fred, you've told us you took that body from Kenosha, Wisconsin and brought it to Chicago, right?

A. Correct.

Q. You told us you burned that body, right?

A. Correct.

Q. And it was your idea, was it not, Mr. Morris, to burn that body?

A. No.

Q. You're telling us it was Taz' idea?

A. Correct.

Q. Let me go back with you about Mr. Jones. You tell us that you knew Fred Jones because you had grown up together, right?

A. Correct.

Q. But all of a sudden you happened to renew your acquaintance?

A. Correct.

Q. And you had no ax to grind with Mr. Jones at that point, right?

A. Correct.

Q. But you sold—or he sold you some bad dope, right?

A. Correct.

Q. And by the way, how long back in 1995 had you been in the dope selling business?

A. Since I was released from prison.

Q. Well, you were released, sir, in June of '95, isn't that what we just heard?

A. Correct.

Q. So was that part of your rehabilitation after your release to enter in the drug business?

A. No.

Q. You began selling drugs in June of 1995?

A. Correct.

Q. And you became familiar with all the appropriate terms, right?

A. Correct.

Q. And the street jargon for drug sales, right?

A. Excuse me?

Q. The street jargon for drug sales?

A. What is jargon?

Q. How about selling weight?

A. Correct.

Q. By the way, did you take a course while you were in the Department of Corrections in how to use a gram scale?

[Defense Counsel]: Objection.

THE COURT: Sustained.

[Prosecutor]: Mr. Jones—strike that. Mr. Morris, did you learn that as part of your on the job dope dealer training?

A. Correct."

The State then asked defendant to identify a green towel, a pair of gym shoes and a golf club from the Wisconsin apartment. These questions followed:

"[Prosecutor]: Mr. Morris, after you strangled Fred, you told us there was blood, right?

A. Correct.

Q. And you did some cleaning around the house, is that right?

A. Yes.

Q. And would it be fair to say that you were cleaning up because you didn't want to leave any evidence, would that be fair?

A. Yes.

Q. Would it be fair to say you were cleaning up because you didn't want anybody to find you responsible for Fred's death, would that be fair?

A. Yes.

Q. Would it be fair to say that you were trying to do everything you could to clean that scene so nothing would come back to you about Fred's death, would that be fair?

A. Yes.

Q. You cleaned off the walls, right?

A. Yes.

Q. You cleaned off the club, right?

A. No.

Q. Are you telling us you left the bloody club?

A. I never touched the golf club.

Q. Did you clean the floor?

A. Yes.

Q. And also, Mr. Morris, you wrapped up Fred Jones?

A. Myself and Taz, yes.

Q. And in order to wrap him up you tied him too, right?

A. Correct.

Q. And you used a television coaxial cable, correct?

A. Correct."

The cross-examination continued with the removal of Jones' body from the Wisconsin apartment, the purchase of the cans of lighter fluid, and the burning of the body:

"[Prosecutor]: Q. Mr. Morris, I'm going to show you a bag and its contents that I've marked People's Exhibit No. 112 for Identification. Do you recognize what's in that bag?

A. Yes.

Q. What do you recognize that to be?

A. Two cans of lighter fluid.

Q. They appear to be the same two cans of lighter fluid that you purchased?

A. Yes, they appear to be.

Q. Now you told us that after you got the cans and you found a place, I think you said behind the school, right?

A. Correct.

Q. You found a place to burn Fred, right?

A. Yes.

Q. And you agreed to that, right?

A. Yes.

Q. You told us you sprinkled lighter fluid on Fred's body?

A. No.

Q. You didn't sprinkle lighter fluid on Fred Jones?

A. On the blanket.

Q. By the way, who's inside the blanket?

A. Fred.

Q. And both you and Taz lit the body on fire?

A. Correct.

Q. You remember striking a match?

A. Yes.

Q. You remember looking down when you put the match down?

A. I can't say if I looked down or not.

Q. What part of the body inside the blanket were you lighting if you remember?

A. I wasn't lighting any part of the body.

Q. What part, whether it was the head area where he was inside the blanket, or his feet, where were you, at his head or his feet?

A. I don't recall.

Q. But you do recall lighting him on fire?

A. Yes.

Q. By the way, Taz didn't force you to light him on fire, did he?

A. No.

Q. Did you watch Fred burn there?

A. No.

Q. How soon after you lit him did you leave?

A. Right after.

Q. Did you watch the flames?

A. No.

Q. Did you see the flames?

A. Yes.

Q. How long did you see the flames?

A. Once I lit the blanket, the flames started, I walked off.

Q. Did you stick around to make sure that he was going to burn?

A. No.

Q. Well, Mr. Morris, wouldn't it be fair to say that you were concerned to make sure that that body got covered up?

A. I guess.

Q. You wanted to make sure that there was no evidence of your killing of Fred Jones, right?

A. Right.

Q. But you're telling us that after you saw a couple of little flames you walked away?

A. True.

Q. By the way, you came back though, right?

A. Right.

Q. When you came back, you came back to throw those cans on the roof of the school, right?

A. Yes.

Q. And when you came back was Fred lit up?

A. Yes.

Q. Did you watch Fred burn there a little bit?

A. No.

Q. You did of course see what Fred looked like while he was burning?

A. No.

Q. You never looked at the body?

A. No.

[Prosecutor]: May I approach, Judge?

THE COURT: Yes.

[Prosecutor]: Mr. Morris, I'm going to show you what I marked as People's Exhibit 113, a photograph. First of all, do you recognize the area that's in that photograph?

A. Yes, I do.

Q. What do you recognize that to be?

A. The place where we burned Fred Jones.

Q. And do you recognize the body of Fred Jones in that picture?

A. No.

Q. You see that black charred area? Do you recognize that as a body?

A. Not really.

Q. Let me show you People's Exhibit No. 114 for [i]dentification, which is a photograph. Do you recognize that?

A. You can see flesh.

Q. You can also see the burnt cable in that photo, is that right?

A. Yes."

The court then commented on the length of the cross-examination:

"THE COURT: It seems to me that this cross-examination is inordinately long.

[Prosecutor]: I plan to wrap it up shortly.

THE COURT: It's been about 45 minutes on a crime that he's not even charged with. There's limitations about how much of other crime evidence should be introduced. He conceded it on his direct examination. I would urge you to wind this thing up.

[Prosecutor]: Understood, Judge.

THE COURT: All right."

At the conclusion of the testimony, the State introduced into evidence the green towel, the gym shoes, the photograph of the closet in the Wisconsin apartment, the cans of lighter fluid, the photograph of the scene of the burning, and the photograph of Jones' charred body. The court later commented:

"THE COURT: I don't think those exhibits should even have been in the courtroom in this trial. For the limited use of proof of other crimes I think the reviewing courts are very clear that the entire case does not get proved up. And there really is no foundation for much of what was referred to. There's some shoes. He did identify a closet.

[Prosecutor]: Judge, I agree with you. We didn't put in the proof of other crimes.

THE COURT: I know.

[Prosecutor]: This was trial strategy on the defendant's part."

In closing argument, the State repeatedly reminded the jury of Fred Jones' murder and asked the jury to draw certain inferences from defendant's testimony:

"[Prosecutor]: Why are they running, folks? Why are they running? Morris just killed a man. Morris just kidnapped a man. Morris has hijacked a man's car. Morris had just killed before. Morris had just burned a body before.

* * *

Why does he need to flee from Kenosha, Wisconsin to Georgia? And on the way, stop here in Chicago and rob some banks. That, ladies and gentlemen, is evidence of his guilt of the crimes here in Chicago.

* * *

Not only is this man a killer, a kidnapper, a hijacker, a dope dealer, a concealer of murder, he is a liar.

* * *

Now it may be cold in here this evening but the chills that came from that stand as that man testified and told

you about the evils that he's done tell you volumes about him, tell you volumes about his ability to take a gun and coldly execute a man. It speaks volumes to tell you where the truth is in this case."

Defendant now contends that his attorney's actions constituted ineffective assistance of counsel. Defendant argues that his attorney's performance was deficient because she discussed the murder of Fred Jones in her opening statement and because she allowed defendant to testify concerning the murder of Fred Jones even though the trial court had agreed to exclude that evidence from trial.

Claims of ineffective assistance of counsel are generally evaluated under the two-part test set forth in *Strickland v. Washington*, 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064 (1984). Under *Strickland*, a defendant must show both that (1) his attorney's performance fell below an objective standard of reasonableness, and (2) that the attorney's deficient performance resulted in prejudice to defendant. The failure to satisfy either prong of the test will preclude a finding of ineffective assistance of counsel under *Strickland*. *People v. Shaw*, 186 Ill. 2d 301, 332 (1998).

In certain exceptional situations, however, the two-part *Strickland* test need not be applied and prejudice may be presumed. See *United States v. Cronic*, 466 U.S. 648, 80 L. Ed. 2d 657, 104 S. Ct. 2039 (1984); *People v. Hattery*, 109 Ill. 2d 449 (1985). In *Cronic*, the Supreme Court noted that when "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable." *Cronic*, 466 U.S. at 659, 80 L. Ed. 2d at 668, 104 S. Ct. at 2047.

This court applied the *Cronic* standard in *People v. Hattery*, 109 Ill. 2d 449 (1985). In *Hattery*, the defendant pleaded not guilty to the murders of a mother and her

two children. *Hattery*, 109 Ill. 2d at 458. Nonetheless, during his opening statement, one of defendant's attorneys conceded that defendant had committed the murders and was eligible for the death penalty, stating that the only issue was whether the defendant should be sentenced to death. *Hattery*, 109 Ill. 2d at 458-59. During the defendant's trial, defendant's attorneys advanced no theory of defense, presented no evidence of their own, and did not make a closing argument to the jury. *Hattery*, 109 Ill. 2d at 459. Instead, defense counsel attempted to show on cross-examination that defendant was compelled to kill the victims. *Hattery*, 109 Ill. 2d at 459. Although compulsion may be a mitigating circumstance sufficient to preclude the imposition of the death penalty, it is not a defense to murder. *Hattery*, 109 Ill. 2d at 459.

Upon review, we held that defense counsel's actions in *Hattery* did not subject the prosecution's case to the meaningful adversarial testing required under the sixth amendment. *Hattery*, 109 Ill. 2d at 464. We noted that defense counsel's trial strategy, which attempted to show that the defendant was guilty of murder but undeserving of the death penalty, was at odds with the defendant's not-guilty plea. *Hattery*, 109 Ill. 2d at 464. We held that "[c]ounsel may not concede his client's guilt in the hope of obtaining a more lenient sentence where a plea of not guilty has been entered, unless the record adequately shows that defendant knowingly and intelligently consented to his counsel's strategy." *Hattery*, 109 Ill. 2d at 465.

For the following reasons, we conclude that *Hattery* applies the appropriate framework for evaluating defendant's claim of ineffective assistance of counsel.

In the case at bar, the possible trial strategies available to defense counsel were narrowly limited by the evidence arrayed against her client. Given defendant's confession, and the fact that defendant was seen fleeing

from Shorter's car only minutes after the murder, counsel could not credibly argue that defendant was not involved in the kidnapping and murder of Ervin Shorter at all. The best that counsel could accomplish was to minimize defendant's culpability for those offenses. This was in fact what counsel attempted to do in her opening statement to the jury and throughout the trial. In her opening statement, counsel maintained that defendant was not the principal instigator of the kidnapping and aggravated vehicular hijacking. In addition, counsel stated that defendant did not actually shoot Shorter and that defendant had lied to the police about shooting Shorter in order to protect his wife. At the close of trial, defense counsel argued to the jury that, because defendant was only minimally involved in the kidnapping and murder, he was not "responsible" for the crimes committed, either morally or legally. Thus, counsel argued to the jury that it should "attach responsibility" for the crimes to the other, more criminally active participants and find defendant not guilty.

Although defense counsel's strategy at trial was to minimize defendant's culpability, the reasoning which she advanced in support of that strategy did not legally absolve defendant of guilt for the charged offenses. Even if the jury accepted everything counsel said in her opening statement as true, and even if the jury believed all of defendant's subsequent testimony, defendant could still have been found guilty on all counts based on a theory of accountability. And, in fact, at the close of trial, the jury was instructed on the issue of accountability. The jury was told that defendant could be found guilty of the charged offenses if the State proved, *inter alia*, that defendant "or one for whose conduct he was legally responsible" performed those offenses. See Illinois Pattern Jury Instructions, Criminal, No. 5.03, Committee Note (4th ed. 2000) (hereinafter IPI Criminal 4th). The

jury was further instructed that defendant could be held legally responsible for the conduct of another in relation to an offense if, either before or during the commission of the offense, and with the intent to promote or facilitate the commission of the offense, defendant knowingly solicited, aided, abetted, agreed to aid, or attempted to aid the other person in the planning or commission of that offense. See IPI Criminal 4th No. 5.03. Thus, for purposes of establishing defendant's guilt for the kidnapping of Shorter and the aggravated vehicular hijacking, it did not matter whether defendant was the principal planner or instigator of those offenses. In addition, for purposes of establishing defendant's guilt of the murder of Ervin Shorter, it did not matter whether defendant or Hoover was the actual shooter. So long as defendant aided Hoover in the murder of Shorter, defendant could be held legally accountable for that crime.

In her opening statement to the jury, defense counsel readily admitted that defendant participated in the kidnapping and murder of Shorter. Counsel told the jury that defendant held a gun to Shorter, searched him, and found a few dollars on him. Counsel also detailed the circumstances of Shorter's murder and defendant's arrest and admitted that defendant was in the alley at the time of the shooting. Subsequently, defendant took the stand and testified regarding the circumstances of Shorter's killing. On cross-examination, defendant admitted that he held a gun on Shorter as they rode in Shorter's car; that he searched Shorter's pockets for money; that he stood by while Shorter was placed in the trunk of the car; that defendant then got back in the car; and that he stood by as Hoover shot Shorter. Consequently, even though defense counsel argued to the jury that defendant did not actually shoot Ervin Shorter, and that he was only minimally culpable for the charged offenses, counsel's argument and defendant's testimony

nevertheless established defendant's guilt based on accountability to those crimes. Indeed, this was precisely the position argued to the jury by the State at closing:

"You also, ladies and gentlemen, based on what the defendant told you, you might as well rip up the not guilty verdicts on the aggravated vehicular hijacking and the aggravated kidnapping. Tear them up right away. Because he just said when he testified, yeah, I participated in all of it. I held that gun to Ervin Shorter's head in the car. I helped. When you're in for a penny, you're in for a pound. You're in for the whole thing. *** If you believe him, he's still guilty."

Defense counsel's opening statement to the jury conceded defendant's guilt based on accountability. Given this fact, defense counsel's strategy at trial can only be viewed as an attempt to establish a nonlegal defense to the criminal charges at issue. Defense counsel's strategy was essentially to plead to the jury for sympathy based on the fact that defendant was not actively involved in the crimes and, therefore, was not "morally responsible" for them. As the State points out, this was not a legal defense but was, instead, "a plea to the jury to engage in jury nullification—to find [defendant] not guilty in spite of the evidence, rather than because of it."

Defense counsel's decision to employ a nonlegal defense is not, by itself, reason to conclude that counsel's assistance in the case at bar falls under the standard of *per se* ineffective assistance described in *Hattery*. As this court has held on several occasions, it is not necessarily *per se* ineffective assistance for a defense attorney to advance a nonlegal defense, such as a plea for jury nullification based on sympathy or compassion, when the circumstances of the case render other defensive strategies unavailable. For example, in *People v. Ganus*, 148 Ill. 2d 466, 473-74 (1992), the defendant maintained that his trial counsel was constitutionally ineffective because counsel elicited prejudicial testimony about gang activity and the defendant's ties to that activity. The testimony

had been introduced in an attempt to establish the affirmative defense of compulsion to the offense of murder, even though that defense was not available to the defendant. *Ganus*, 148 Ill. 2d at 471. In concluding that trial counsel was not ineffective, this court stated:

> "What the instant case presents is a situation where the defendant literally had no defense. Evidence of his guilt was overwhelming. His counsel conceived a compulsion defense which, though not a legal defense, could or might have persuaded a jury not to convict. Jury nullification is always a possibility. It is not inconceivable that a compulsion defense might have evoked empathy, compassion or understanding and sympathy in the minds of the jurors. It is a truism that if a man is drowning, he will grasp at a straw that comes floating by. A weak or insufficient defense does not indicate ineffectiveness of counsel in a case where a defendant has no defense. In this case it would appear that defense counsel used his imagination and resourcefulness to come up with something where he had nothing to go on." *Ganus*, 148 Ill. 2d at 473-74.

See also *People v. Williams*, 192 Ill. 2d 548, 567 (2000); *People v. Nieves*, 192 Ill. 2d 487, 495 (2000); *People v. Shatner*, 174 Ill. 2d 133, 147-48 (1996); *People v. Page*, 155 Ill. 2d 232, 265 (1993).

Under *Ganus*, defense counsel's performance in the case at bar cannot be considered *per se* ineffective simply because the defense which she offered at trial was a nonlegal plea for jury sympathy. Although this strategy was perhaps the most minimal trial strategy possible, it was constitutionally permissible, given the nature and extent of the evidence against her client. See *Ganus*, 148 Ill. 2d at 473-74. The difficulty in the present case, however, and a distinguishing factor between this case and *Ganus*, is that in addition to advancing a minimal, nonlegal defense, counsel in the case at bar also erroneously introduced defendant's involvement in the murder of Fred Jones.

With respect to the Jones murder, the State initially

contends that defense counsel merely wanted to "front" information concerning that murder. According to the State, defense counsel's decision to introduce the Jones murder was a matter of trial strategy and, therefore, cannot be considered constitutionally deficient. This contention is not supported by the record.

After her opening statement to the jury, defense counsel explained to the trial court that she had discussed the Jones murder because she thought the court had ruled that evidence of this murder would be admissible by the State "in rebuttal." Counsel did *not* state that she had properly understood the court's ruling and that she was nevertheless pursuing a strategy that involved raising the Jones murder. While defense counsel evidently believed that she had to "front" the Jones murder, the only reason she maintained this belief was because she had misunderstood the court's ruling on whether evidence regarding the Jones murder was admissible. Similarly, defendant's indication that he had "no problem" with defense counsel's introduction of the Jones murder is of little relevance since defendant's understanding of the need to discuss the murder was undoubtedly based on defense counsel's misapprehension that the evidence would be introduced at trial by the State. Based on the record before us, it is clear that counsel's decision to introduce extensive and inflammatory evidence regarding the Jones murder, and defendant's apparent consent to that decision, were not the product of an informed, strategic choice. Rather, these actions were the product of a mistaken belief that the trial court had ruled evidence of the Jones murder admissible at trial when, in fact, the trial court had ruled just the opposite.

Defense counsel's fundamental, and inexcusable, failure to comprehend the trial court's ruling regarding the Fred Jones murder had severe repercussions at trial.

As discussed previously, counsel's trial strategy was, in effect, a plea for jury nullification based on sympathy or understanding for defendant's minimal involvement in the crimes at issue. Any hope of success for this strategy, however minimal that might have been, rested not only on the jury finding defendant credible on the witness stand—and thus believing his explanation that he did not shoot Shorter and was only minimally involved in the crimes—but also on the jury having some degree of understanding or empathy for defendant. However, once counsel introduced extensive evidence regarding the Jones murder, this strategy was completely destroyed. As defendant points out, the defense's effort to convince the jury that defendant had waited in the car while Shorter was murdered—the version of events testified to by defendant at trial—was wholly undone by evidence that defendant had been an active participant in another murder just 36 hours before Shorter was killed. After hearing that defendant had held Jones while he was beaten with a club and that defendant had then strangled Jones with a towel, it would have been extremely difficult, if not impossible, for any juror to believe that defendant had merely sat in the car while Hoover shot Shorter. More broadly, defense counsel could hardly have made a credible plea for the jury's sympathy with respect to defendant's involvement in the kidnapping and murder of Ervin Shorter when counsel had just graphically, and in considerable detail, described her client's participation in the brutal murder of Fred Jones. Accordingly, it is not an overstatement to conclude that defense counsel's erroneous introduction of the evidence pertaining to the Jones murder eviscerated the minimal trial strategy that was available to her.

Our conclusion that defense counsel's introduction of evidence pertaining to the Jones murder rendered her trial strategy a nullity is based upon the extremely broad

scope and highly inflammatory nature of the evidence about the Jones murder which counsel introduced. Before the jury, counsel essentially indicted and tried defendant for Jones' murder and the concealment of Jones' death. Counsel vividly described the events leading up to the murder of Jones. She detailed the "vicious beating," noting that "[t]here was blood everywhere." She stated that defendant placed a plastic bag over Jones' head "to prevent the mess from getting any bigger. The mess from snuffing out a human life." Counsel explained defendant's attempts to conceal the murder. She told the jury that defendant bought two cans of lighter fluid with Jones' money. She told the jury that defendant poured lighter fluid on Jones' body and set it on fire. The jury was then given proof of Jones' murder when defendant took the witness stand and testified regarding the murder. In responding to defense counsel's questions, defendant described the murder in detail. He also described transporting Jones' body to Chicago and using cans of lighter fluid to burn the body. Thereafter, defendant was exposed to a lengthy cross-examination by the State regarding Jones' murder. The State was permitted to introduce into evidence numerous exhibits related to Jones' murder. These exhibits, including the cans of lighter fluid and the photographs of Jones' charred body, corroborated counsel's admission in opening statement that defendant killed Jones and attempted to conceal Jones' body.

This case contains an unusual convergence of errors that bring it within the holding of *Hattery*. Defense counsel's erroneous understanding of the trial court's ruling on the Jones murder opened the door to the introduction of graphic details regarding the murder, to the State cross-examining defendant for 45 minutes about the crime, and to defendant's admission of guilt for that murder. Once defense counsel introduced the

extensive and inflammatory evidence regarding the Jones murder, the minimal but constitutionally acceptable strategy of appealing to the jury's sympathy regarding the murder of Ervin Shorter was utterly negated. Counsel's deficiencies in this case are distinguishable from typical trial error "not [in] degree but [in] kind." *Bell v. Cone*, 535 U.S. 685, 697, 152 L. Ed. 2d 914, 928, 122 S. Ct. 1843, 1851 (2002). For in all practical effect, as a result of defense counsel's actions, defendant stood before the jury throughout the trial with no defensive strategy whatsoever. Even construing *Hattery* narrowly, as we must (see *People v. Johnson*, 128 Ill. 2d 253, 269 (1989)), under the unique and egregious circumstances presented here, we are forced to conclude that there was a breakdown of the adversarial process during defendant's trial such that there was no meaningful adversarial testing of defendant's case. Accordingly, defendant's convictions must be reversed and the cause remanded for a new trial.

## CONCLUSION

For the foregoing reasons, the judgment of the circuit court is reversed and the cause is remanded for a new trial.

*Reversed and remanded.*

JUSTICE FITZGERALD, specially concurring:

The majority correctly concludes that defense counsel's inflammatory and highly prejudicial opening statement rendered her trial strategy a nullity such that there was a total breakdown of the adversarial process. Defense counsel's egregious conduct in the course of her opening statement, although a result of misunderstanding, created a level of prejudice that could not be undone. Specifically, defendant was left with no meaningful defense once counsel admitted defendant's participation in the kidnapping of the victim, followed by her vivid and lengthy

description of defendant's participation in the Kenosha murder, including the vicious beating, bloody crime scene, and attempted cover-up. It is this result—the very absence of any meaningful defense—that compels me to join the majority.

I write separately to underscore a key element of the majority's holding, namely, that *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984), is still the standard by which we judge ineffective assistance of counsel claims. It is neither practice nor custom to presume prejudice, and it is only under the rarest of circumstances that we will depart from the well-settled standard set forth in *Strickland*. The presumption of prejudice only arises where "counsel *entirely* fails to subject the prosecution's case to meaningful adversarial testing." (Emphasis added.) *United States v. Cronic*, 466 U.S. 648, 659, 80 L. Ed. 2d 657, 668, 104 S. Ct. 2039, 2047 (1984). In this case, the presumption of prejudice was not warranted based solely upon the introduction of the Kenosha murder or, alternatively, upon counsel's admission that defendant participated in the murder such that he was liable under a theory of accountability. Rather, as aptly stated by the majority, it is only the "unusual convergence of errors" that denied defendant any meaningful defense theory. 209 Ill. 2d at 187. Clearly, this holding does not limit the legitimate strategies that sometimes must be formulated in cases of overwhelming evidence of guilt. See, *e.g.*, *People v. Ganus*, 148 Ill. 2d 466, 473-74 (1992).

As an additional matter, like the majority, I observe that counsel's error was based upon an honest failure to comprehend the trial court's ruling about the admissibility of the Kenosha murder. See 209 Ill. 2d at 185-86. I write separately, however, to remind all counsel of their ethical obligations to both the court and their clients. This case highlights that counsel are often presented

with difficult tactical decisions in their attempts to achieve the best available defense. Our rules of conduct require zealous advocacy in pursuit of those interests, and in this case, there is clearly no suggestion that counsel did not satisfy this obligation. Nonetheless, I take this opportunity to caution all counsel that this court will not tolerate the use of unscrupulous tactics in the name of zealous advocacy. Plainly speaking, this court will not tolerate counsel "manufacturing" reversible error any more than we would tolerate a prosecutor using unethical tactics to obtain a conviction. Our system of justice depends upon the ethical behavior and integrity of all those who represent it.

JUSTICE FREEMAN joins in this special concurrence.

JUSTICE THOMAS, concurring in part and dissenting in part:

I agree with the majority that the trial court properly denied defendant's motion to suppress, and I therefore concur in that portion of the majority opinion. However, I disagree with the majority's finding that, with regard to defendant's claim of ineffective assistance of counsel, prejudice must be presumed based upon defense counsel's actions in this case. Therefore, I respectfully dissent from that portion of the majority opinion.

As the majority observes, the United States Supreme Court decisions in *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984), and *United States v. Cronic*, 466 U.S. 648, 80 L. Ed. 2d 657, 104 S. Ct. 2039 (1984), set forth the standards for evaluating ineffective assistance of counsel claims. In general, the familiar *Strickland* standard applies: in order to establish ineffective assistance of counsel, a defendant must show both that his attorney's performance fell below an objective standard of reasonableness and that his attorney's

deficient performance resulted in prejudice to the defendant. *Strickland*, 466 U.S. at 687-88, 694, 80 L. Ed. 2d at 693, 698, 104 S. Ct. at 2064, 2068. However, in *Cronic*, the Supreme Court recognized three situations so likely to prejudice an accused that prejudice would be presumed. *Cronic*, 466 U.S. at 658, 80 L. Ed. 2d at 667-68, 104 S. Ct. at 2046-47. The first situation is where a defendant was denied the presence of counsel at a critical stage. *Cronic*, 466 U.S. at 659, 80 L. Ed. 2d at 668, 104 S. Ct. at 2047. The second situation is where counsel entirely fails to subject the prosecution's case to meaningful adversarial testing. *Cronic*, 466 U.S. at 659, 80 L. Ed. 2d at 668, 104 S. Ct. at 2047. The third situation is where counsel is called upon to render assistance under circumstances where competent counsel very likely could not due to surrounding circumstances. *Cronic*, 466 U.S. at 659-60, 80 L. Ed. 2d at 668, 104 S. Ct. at 2047.

Until today, in addressing the second situation set forth in *Cronic*, this court consistently has refused to presume prejudice unless a defendant's attorney entirely failed to subject the prosecution's case to meaningful adversarial testing. Thus, in *People v. Hattery*, 109 Ill. 2d 449 (1985), this court applied the *Cronic* standard to the defendant's ineffective assistance of counsel claim, finding that the defense counsel's actions did not subject the prosecution's case to meaningful adversarial testing. We observed that one of defendant's attorneys conceded the defendant's guilt in his opening statement despite the defendant's not-guilty plea. *Hattery*, 109 Ill. 2d at 458-59. In addition, defense counsel advanced no theory of defense, presented no evidence of their own, and did not make a closing argument to the jury. *Hattery*, 109 Ill. 2d at 459.

In contrast, in cases subsequent to *Hattery*, this court declined to presume prejudice, even where defense counsel conceded a client's guilt, if the defense counsel

otherwise acted as the defendant's advocate during the proceedings. See *People v. Williams*, 192 Ill. 2d 548, 567 (2000) (no presumption of prejudice where defense counsel aggressively cross-examined State's witnesses, argued for not-guilty verdict in opening statement and closing argument, and moved to suppress defendant's statement); *People v. Nieves*, 192 Ill. 2d 487 (2000) (no presumption of prejudice where defense counsel extensively cross-examined State's witnesses, called witness on behalf of defendant, and argued forcefully defendant should be found "not guilty"); *People v. Shatner*, 174 Ill. 2d 133 (1996) (no presumption of prejudice where defense counsel aggressively cross-examined virtually all State's witnesses and called several witnesses on defendant's behalf); *People v. Page*, 155 Ill. 2d 232 (1993)(case distinguishable from *Hattery* because defense counsel cross-examined State's witnesses, objected to allegedly improper evidence and argument, and moved for directed verdict); *People v. Ganus*, 148 Ill. 2d 466, 473 (1992) (case distinguishable from *Hattery* because record showed defendant consented to counsel's trial strategy).

Clearly, then, a presumption of prejudice where defense counsel entirely fails to subject the prosecution's case to meaningful adversarial testing requires just that: an entire failure of adversarial testing. Here, as in *Williams, Nieves, Shatner, Page* and *Ganus*, defense counsel *did* act as defendant's advocate throughout the proceedings. Defense counsel made an opening statement and closing argument and presented evidence on defendant's behalf. Defense counsel cross-examined the State's witnesses. Defense counsel tried to persuade the jury that defendant's confession was a lie told to protect defendant's wife, and that it was Hoover, not defendant, that killed Shorter. In addition, and in contrast to *Hattery*, defendant consented on the record to his counsel's actions in conceding his guilt to the murder of Fred Jones.

The majority's finding that defense counsel's actions in this case entirely failed to subject the prosecution's case to meaningful adversarial testing is contrary to the well-established precedent of this court. In addition, the majority's decision also is contrary to the recent decision of the United States Supreme Court in *Bell v. Cone*, 535 U.S. 685, 152 L. Ed. 2d 914, 122 S. Ct. 1843 (2002).

In *Bell*, the Supreme Court explained that "[w]hen we spoke in *Cronic* of the possibility of presuming prejudice based on an attorney's failure to test the prosecutor's case, we indicated that the attorney's failure must be complete." *Bell v. Cone*, 535 U.S. 685, 696-97, 152 L. Ed. 2d 914, 928, 122 S. Ct. 1843, 1851 (2002). Thus, the Court in *Bell* rejected a defendant's claim that his case was one in which prejudice must be presumed. The Court stated that "respondent's argument is not that his counsel failed to oppose the prosecution throughout the sentencing proceeding as a whole, but that his counsel failed to do so at specific points. For purposes of distinguishing between the rule of *Strickland* and that of *Cronic*, this difference is not of degree but of kind." *Bell*, 535 U.S. at 697, 152 L. Ed. 2d at 928, 122 S. Ct. at 1851.

Defense counsel's failure in this case, while certainly serious and significant, was not complete. As in *Bell*, defendant's claim in this case was not that his defense counsel failed to oppose the prosecution throughout the trial, but that his counsel failed to do so at specific points. The majority attempts to fit this case within the parameters of *Bell* by finding that "in all practical effect, as a result of defense counsel's actions, defendant stood before the jury throughout the trial with no defensive strategy whatsoever." 209 Ill. 2d at 188. *Bell* and *Cronic*, however, require more than a failure in defensive strategy. *Bell* clarifies that *Cronic* requires a complete failure in advocacy before prejudice may be presumed. Defense counsel's representation here did not amount to a

complete failure in advocacy. Under the circumstances, *Bell* requires analysis of defendant's ineffective assistance of counsel claim under *Strickland*, not *Cronic*. For that reason, I dissent from the majority's finding that prejudice must be presumed based upon counsel's actions in this case.