**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2024 IL App (3d) 220504-U

Order filed December 11, 2024

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2024

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 21st Judicial Circuit, Kankakee County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-22-0504 Circuit No. 19-CF-364 |
| ZACHARY JENSEN, | ) ) ) | Honorable Kathy S. Bradshaw-Elliott, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE HOLDRIDGE delivered the judgment of the court.
Presiding Justice McDade and Justice Brennan concurred in the judgment.

_____

**ORDER**

¶ 1    *Held*:   Defense counsel's representation did not amount to ineffective assistance.

¶ 2    The defendant, Zachary Jensen, appeals from his convictions for armed robbery. The defendant argues he was provided ineffective assistance of counsel where counsel "repeatedly elicited prejudicial evidence that only served to strengthen the State's case."

¶ 3                                    I. BACKGROUND

¶ 4       The defendant was charged with two counts of armed robbery (720 ILCS 5/18-2(a)(2) (West 2018)). The charges alleged the defendant stole money and cell phones from Alexander Randak and Kaleigh Swinford by the use of force or by threatening the imminent use of force while armed with a firearm. The defendant was arrested on May 28, 2019, in Florida and extradited to Kankakee County.

¶ 5       The defendant was initially represented by a public defender and trial was set for April 19, 2021. At a pretrial conference on March 25, 2021, private counsel entered his appearance. Counsel indicated he intended to proceed with the April 19 trial date. The State expressed concerns since counsel had not yet received discovery and noted there were "extensive records" in this matter. At a subsequent conference, counsel requested a new trial date. The court stated it would not provide counsel a new trial date until it was sure he had reviewed all the discovery. The court wanted to ensure "we're not in the middle of a trial and have people saying I don't have that stuff and [have] not watched it."

¶ 6       The trial began on July 26, 2022. Swinford testified she and Randak arrived at Kankakee State Park at approximately 5:30 p.m. on May 19, 2019. They walked from the parking lot down a path and sat on a bench near the creek. Swinford stated they stayed there for "maybe less than an hour." Swinford saw "two young men loitering in the tree line near the creek between the bench and Route 102," as she and Randak were about to leave the park. They began walking on the path back to their car. The two men began walking in front of Randak and Swinford, heading in the same direction.

¶ 7       Randak and Swinford turned to go to the parking lot while the two men continued down the path to Route 102. Swinford heard footsteps approaching them. A voice yelled at Randak and Swinford to "get on the ground." Swinford turned around and saw one man pointing a gun at her

2

and the other man standing behind him. The man without the gun was "short and stocky," with "reddish short hair, and he was wearing a white wifebeater." The other man was taller, skinnier, and older than his accomplice with "brown, shaggy hair that fell across his forehead." Swinford made an in-court identification of the defendant as the individual with the gun. She testified it was an automatic handgun. Swinford identified the handgun used by the defendant.

¶ 8       Swinford and Randak lay on the ground. The defendant told them to hand over their cell phones and any money they had. Randak gave them his cell phone and money. The defendant asked for the passcode to the cell phone. Randak was too nervous to speak, so Swinford told the defendant the passcode. Swinford then heard the gun "cock." Swinford gave them her cell phone and put her head back on the ground. The defendant and the other man left.

¶ 9       Randak and Swinford stayed on the ground for several minutes after the two men left. They drove to Swinford's work and called Swinford's mother. Swinford's mother drove them to the police station where they gave statements.

¶ 10      Three weeks later, Swinford returned to the police department for a photographic lineup. The lineup was computerized and video recorded. After playing the video, defense counsel moved to strike because it did not show Swinford making any utterances. The objection was overruled.

¶ 11      On cross-examination, counsel questioned Swinford as to discrepancies between her testimony and her statement to the police. In her statement, Swinford stated they had returned to "our cars," after the robbery even though they only drove one vehicle. Counsel also elicited testimony that Swinford's statement inaccurately stated, "[t]hey told us not to get up," even though only one man spoke throughout the incident. Swinford stated the inaccuracies were likely because she was "frazzled" when writing it. Counsel asked why she was "frazzled," and Swinford stated, "I was anxious because I had had what I would consider a near-death experience hours prior."

Counsel further pointed out key pieces of information missing from her statement, including that the gun was cocked, that the taller man walked with a "gangster-like limp," and that only one man played an active role in the robbery. Swinford stated she was told to keep her statement brief. Defense counsel elicited testimony that Swinford told the police the man with the gun was between 120 and 150 pounds and 5 feet, 10 inches tall. Swinford stated she had very limited knowledge of guns and had never handled a revolver or automatic firearm. At one point Swinford stated, "You don't forget the face of somebody who is pointing a gun at your head," and counsel asked her to repeat herself.

¶ 12     Randak's testimony largely mirrored Swinford's testimony. At the police station, Randak spoke to an officer for 20 to 30 minutes. The conversation was not recorded. He told the officer he had two tracking applications on his cell phone. One application showed his phone had pinged in Chicago Heights. Randak then made his written statement.

¶ 13     Randak returned to the police station three weeks later for the photographic lineup. The lineup was also computerized and video recorded. The recording was entered into evidence. Defense counsel objected to its admission, stating "I don't understand their software program." The court overruled the objection, stating "[y]ou may not [understand], but I'm assuming a police officer is going to testify."

¶ 14     On cross-examination, counsel asked, "who was the man with the gun?" to which Randak replied, "Your client." Counsel later asked, "And that's how you [identified defendant], right" to which Randak replied, "No." Counsel then asked, "because he's sitting at the table with me?" to which Randak replied, "I identified him three years ago." Counsel further requested Randak repeat the description of the gunman he gave to police. Throughout the cross-examination of both Randak

4

and Swinford, counsel expressed confusion as to the photographic lineup and its procedure and asked both Swinford and Randak several questions regarding the identification process.

¶ 15    Counsel elicited testimony that Randak had very limited knowledge of guns and had never handled a firearm. Counsel questioned Randak regarding the lack of specificity in his statement before reading it in its entirety: "Me and [Swinford] were walking back to her truck. Two kids came up behind us and told us to get down. We complied. They took our phones and money. We stayed down until they left." Randak confirmed that following the incident he described the man with the gun as 5 feet, 11 inches, and 160 pounds.

¶ 16    Special Agent Kurt Messer of the Illinois State Police testified he was assigned to investigate the incident. Messer interviewed Swinford and Randak the night of the incident. During Randak's interview, a tracking application on his cell phone was used. The application showed the phone had pinged near a used cell phone store. Messer went to the store the next day. The owner was uncooperative. Messer obtained video footage from nearby stores. The footage showed "an individual matching the description," given by Randak and Swinford. Messer conducted interviews in the area and identified the defendant and Krystian Raczka as suspects. Messer believed the defendant was living with his father, Paul Jensen, and surveilled the apartment before effectuating a traffic stop on a car outside the apartment. Paul and Raczka were in the vehicle.

¶ 17    Messer created a photographic lineup using "eLineup software." Messer entered the defendant's age, weight, height, hair features, glasses, and skin tone. The system then created a lineup using photographs of other individuals who had been in custody. Defense counsel objected to testimony regarding the software due to the lack of foundation, which was overruled. Messer identified printouts of both lineups in which Randak and Swinford identified the defendant, which were admitted into evidence.

¶ 18    Counsel began his cross-examination by asking Messer from where the defendant's photograph in the lineup was obtained. The State objected and asked for a sidebar. When the parties came back on the record, defense counsel stated, "Judge, I'd like to ask the question. I'm sorry." The State responded, "[t]hat's fine." The court replied, "If you want to ask the question, you may. You've been warned." Counsel again asked where the defendant's photograph in the lineup came from. Messer replied it was from a police department in Florida.

¶ 19    Counsel questioned why there was no printout or other physical evidence to show that Randak's cell phone pinged near the cell phone store. Messer confirmed he did not have a printout or photograph to show the ping. Counsel then asked, "[s]o you're asking this jury to take your word for all of this, right?" Messer replied, "I couldn't have accidentally ended up at that cell phone shop. How would I get to Chicago Ridge from Kankakee without knowing the phone pinged there?" Counsel asked Messer to reiterate the descriptions of the perpetrators provided by Swinford and Randak. Messer read from his police report the descriptions. Counsel asked Messer, "How did you tie that gun to [defendant]?" to which Messer replied, "[The defendant]'s father told us this gun was in his apartment and indicated it belonged to the [defendant]."

¶ 20    Counsel asked Messer whether he had charged anyone else for the robbery. Messer responded, "I charged [Raczka], *** and he was convicted." Counsel moved to strike the response. Outside the presence of the jury, the State commented that counsel was "walking us into a mistrial," and counsel then requested a mistrial based on Messer's response. Counsel was unaware Raczka was convicted in juvenile court. The State and the court warned counsel he should not ask questions to which he does not know the answers. The court refused to strike the answer or declare a mistrial.

6

¶ 21      Later, with the jury present, counsel asked Messer whether the defendant was in the vehicle during the traffic stop outside Paul's apartment. Messer responded that "No. He already fled the state." After comments from the parties and the court, defense counsel responded, "Okay. Mr.— you're so smart. *** He fled the state. *** Tell us all about that. Tell us how—how you know he fled the state. And when did he leave the State? When did he flee, sir?" Messer began to respond when counsel cut him off to ask, "No, no, when did he flee the state? *** Give us a date. Give us a time. Give us something." Messer replied, "I'd have to review the Florida police officer's reports relative to a separate incident that occurred regarding the vehicle used in the armed robbery to answer that question." Counsel stated the Florida report was not in his possession. The State assured counsel and the court it was provided in discovery. Counsel continued, "So he's in Florida ***. Is there anything more goofy you want to tell us today?" During a sidebar, counsel repeatedly claimed he had never seen the Florida report before locating it in his materials. Counsel stated he did not know what Florida had to do with the instant case. The court responded that counsel had opened the door through his questions. Counsel asked for a mistrial based on Messer's testimony. The court stated Messer's testimony was the result of counsel's questions and denied the motion.

¶ 22      Chris Linares, an investigator with the Illinois State Police, testified that on May 21, 2019, he received information that the defendant might be living at Paul's apartment. Linares received consent to search the apartment from Paul. The defendant was not present. As Linares was leaving the apartment, Paul's father told him he found a black bag containing an automatic pistol in the defendant's sister's closet. Linares identified the gun found in the closet.

¶ 23      On cross-examination, counsel elicited testimony that Linares was unaware Raczka was living at Paul's apartment at the time. Counsel also confirmed Linares was unaware if the defendant lived at the apartment at the time he searched it. After the traffic stop, Linares reviewed

security footage from the surrounding area and could not recall whether he saw the defendant on any of the footage.

¶ 24        A fingerprint expert testified no usable fingerprints were found on the gun or the collected magazines and cartridges. The parties met outside the presence of the jury after proceedings to discuss sanctions against counsel for repeatedly making comments while questioning the witnesses despite the court's admonishments. Counsel expressed anger over Messer's testimony. The court stated, "you need to be careful what you ask because your questions are eliciting things that I would not let in if you didn't open the door. It's the truth of it."

¶ 25        Anthony Jensen, the defendant's brother, testified that he, the defendant, Raczka, and two others were at Kankakee State Park on May 19, 2019. As they were leaving, they pulled over so the defendant and Raczka could use the restroom. The two men exited the vehicle and walked behind bushes. They were gone 60 to 90 seconds.

¶ 26        Defense counsel elicited testimony that the defendant's mother lived in Florida. The State argued the testimony was irrelevant. An offer of proof was held in which Anthony testified their mother lived in Florida and the defendant would visit her several times a year. The defendant would tell Anthony and Paul when he left for these visits. Anthony did not know where the defendant was on May 21, 2019. The court ruled the evidence was only relevant if the State was going to argue flight. The State replied, "I was not going to mention that he fled the state, but now I am." The court further ruled Anthony could not testify regarding anything the defendant had told him. When the jury returned, Anthony testified their mother lived in Florida, but was precluded from answering whether the defendant visited her.

¶ 27        On redirect, the State introduced Anthony's videotaped interview with police. Defense counsel objected to the video being played for impeachment purposes. The court overruled the

objection, and the video was played and admitted into evidence. The video contained references to the defendant's criminal record, including a statement by Messer that the defendant had "done this before. He's known to do this." The State rested.

¶ 28    Defense counsel gave his opening statement. He claimed Raczka was the man with the gun and mentioned that Raczka had made a statement. The State's objection was sustained. Counsel continued, "But as far as—you know, I don't know what his statement was, quite frankly."

¶ 29    Paul testified that on May 20 or 21, 2019, he and Raczka left Paul's apartment. They were stopped by police, and Raczka was arrested. Paul testified Linares entered his apartment without a warrant. After Linares left, Paul noticed a black bag in his daughter's closet with what appeared to be a handgun inside and went outside to tell Linares.

¶ 30    The police returned to the apartment to look for the defendant. Paul called the defendant so the police could speak to him. An officer told the defendant he needed to return to Illinois because they wanted to talk to him, but that the defendant was not in trouble. The defendant replied, "I'm not coming back."

¶ 31    Counsel asked Paul if he knew what happened to Raczka, which drew an objection from the State. During an offer of proof, Paul testified he did not see Raczka for a long time after Raczka's arrest. Paul testified Raczka stated he was going to testify that the police "made him say what he had to say." However, Raczka died in February 2022. When asked about the relevancy of the testimony, counsel stated, "[w]e're missing a witness is the relevance." Defense counsel further asserted he "want[ed] the facts out." The State responded, "[d]o you want the facts out of what [Raczka] said in juvenile court? Do you want that fact out that he puts the gun in [the defendant's] hand and says [the defendant] did it? Do you want that fact out?" The court determined Raczka's statements and subsequent suicide were irrelevant. When the jury returned, Paul testified the

9

defendant's mother lived in Florida and the defendant would visit her once a year. The defendant would normally stay for a week or two.

¶ 32        The defendant testified he was six feet, two inches tall and weighed 245 pounds. On May 19, 2019, he visited Kankakee State Park. Upon leaving, the defendant asked the driver to pull over so he could use the restroom. He and Raczka exited the vehicle, walked up to some bushes, and then went home. He and Raczka were out of the vehicle for approximately 90 seconds. The defendant denied robbing anyone, carrying a gun that day, or going to the cell phone store.

¶ 33        The defendant visited his mother in Florida either the night of May 19, 2019, or the next day. Counsel asked the defendant when he returned to Illinois. The State's relevancy objection was sustained. However, the State asked the court to let the defendant answer. The defendant responded he was in a Florida County jail for unrelated crimes for over a month before being extradited to Illinois.

¶ 34        During closing arguments, the State argued the defendant fled to Florida after the robbery, demonstrating consciousness of guilt. Defense counsel primarily attacked the credibility of the investigating officers and the reliability of the victims' identification of the defendant. Counsel also highlighted the lack of fingerprints on the gun and the fact that the defendant did not live at the apartment at the time of the incident or when the firearm was discovered. The jury found the defendant guilty on both counts. Defense counsel filed a motion for a new trial arguing the court erred in denying counsel's motion for a mistrial after Messer's testimony. Counsel filed a supplement to the motion stating he did not read the Florida report because it was not relevant. Counsel further argued the photograph of the defendant in the lineup was improper since there was no evidence as to where or when it was taken.

¶ 35    At the hearing on the motion, defense counsel stated he never received Raczka's statements to police. The State produced a signed statement indicating counsel received the materials. During the hearing, the court stated, "I actually had to threaten you with sanctions because you actually kept opening doors, and I was concerned about those doors that you opened." The court denied the motion. The defendant was sentenced to concurrent terms of 25 years' imprisonment for each count.

¶ 36                                II. ANALYSIS

¶ 37    On appeal, the defendant argues counsel was ineffective for repeatedly eliciting prejudicial evidence. Illinois courts review claims of ineffective assistance of counsel under the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Wise*, 2019 IL App (2d) 160611, ¶ 51. Under *Strickland*, counsel renders ineffective assistance when (1) counsel's performance falls below an objective standard of reasonableness, and (2) there is a reasonable probability that, but for counsel's deficient performance, the results of the proceedings would have had a different outcome. *Id.* "The failure to satisfy either the deficiency prong or the prejudice prong of the *Strickland* test precludes a finding of ineffective assistance of counsel." *People v. Enis*, 194 Ill. 2d 361, 377 (2000). "A defendant bears the burden of proof on both elements of this test ***." *People v. Burks*, 343 Ill. App. 3d 765, 775 (2003). We review claims of ineffective assistance of counsel *de novo* if they were not raised in the circuit court. *People v. Lofton*, 2015 IL App (2d) 130135, ¶ 24.

¶ 38    Prejudice is presumed where counsel "*entirely* fails to subject the prosecution's case to meaningful adversarial testing[.]" (Emphasis added.) *United States v. Cronic*, 466 U.S. 648, 659 (1984). Failure to subject the prosecution's case to meaningful adversarial testing on a specific point is insufficient. *Bell v. Cone*, 535 U.S. 685, 697 (2002). Instead, the *Cronic* exception will

11

only apply where counsel failed to oppose the prosecution throughout the proceedings as a whole. *Id.* Only representation that equates to nonrepresentation triggers a presumption of prejudice. *People v. Cherry*, 2016 IL 118728, ¶ 26. Where counsel provides poor representation but contests any portion of the prosecution's case, the normal *Strickland* analysis is more appropriate. *Id.*

¶ 39　　The *Cronic* exception is narrow and infrequently applies. *Florida v. Nixon*, 543 U.S. 175, 190 (2004). It is so narrow in fact that the Illinois Supreme Court has applied it only twice, and only where counsel fully admitted the defendants' guilt. *People v. Hattery*, 109 Ill. 2d 449, 458 (1985); *People v. Morris*, 209 Ill. 2d 137, 187 (2004). In *Hattery*, defense counsel admitted the defendant's guilt in his opening statement, presented no theory of defense or evidence of his own, and did not make a closing argument. *Hattery*, 109 Ill. 2d at 459. In *Morris*, counsel admitted the defendant's guilt during opening argument to pursue the "minimal, nonlegal" plea for jury sympathy. *Morris*, 209 Ill. 2d at 184. Counsel then introduced "extensive and inflammatory evidence" regarding a separate murder which the court previously ruled would be barred on the defendant's motion. *Id.* at 185.

¶ 40　　Here, even if we were to presume that counsel's performance fell below an objective standard of reasonableness, we cannot say that the defendant was prejudiced by counsel's performance either under the narrow *Cronic* standard or *Strickland*. Regarding *Cronic* the defendant acknowledges, counsel did not admit the defendant's guilt. Instead, counsel did what he could to defend against the charges, despite the evidence stacked against the defendant. The State's case primarily relied upon the victims' identifications of the defendant, Messer's tracking of the cell phone and subsequent identification of the defendant and Raczka as suspects, and the discovery of the firearm used during the robbery in Paul's apartment. On each of these points, defense counsel vigorously cross-examined the witnesses. Counsel repeatedly attempted to

12

discredit the victims' identification of the defendant. Notably, counsel highlighted the discrepancy between their description of the perpetrator as under six feet tall and 160 pounds or lighter, and the defendant's actual height and weight of well over six feet tall and 245 pounds. Counsel further elicited testimony regarding the lack of information contained in Randak and Swinford's statements, inaccuracies in Swinford's statement, and Randak and Swinford's lack of firearm knowledge. Counsel questioned Messer regarding why there was nothing in his file demonstrating that the stolen phone pinged outside the cell phone store. Finally, counsel confirmed with Linares that the gun was found in the defendant's sister's room before establishing that others lived at the apartment. Defense counsel further elicited testimony that Linares did not know whether the defendant lived at the apartment or how long it had been since the defendant had lived there.

¶ 41    The record as a whole demonstrates counsel attacked key points of the State's case. While the defendant parses the record, takes issue with defense counsel's confrontational and sometimes disorganized approach, and discusses the way counsel phrased certain questions, counsel's performance "hardly rises to the level of entirely fail[ing] to subject the prosecution's case to meaningful adversarial testing." (Internal quotation marks omitted.) *Cherry*, 2016 IL 118728, ¶ 29. We need not discuss each of the specific instances the defendant takes issue with. Therefore, we find that the *Cronic* exception does not apply, and we will not presume prejudice. *Id.* ¶ 30.

¶ 42    Moreover, we find that the defendant cannot show that the result of the trial would have been different absent counsel's deficient performance. The State's evidence was overwhelming, and included the victims' identifications of the defendant, video footage of the defendant near the cell phone store where the stolen cell phone pinged, and the location of the firearm used in the robbery in Paul's apartment. This evidence would have been admitted at trial regardless of counsel's allegedly deficient performance. The allegedly erroneous admission of the defendant's

13

flight to Florida had no effect on these crucial pieces of evidence, which were firmly established by the State. Further, the defendant testified he was at the park on the date of the robbery and that he and Raczka exited the vehicle to use the bathroom at the time of the robbery, only bolstering Swinford and Randak's testimony and identification. This possibly harmful testimony cannot be laid at counsel's doorstep as the decision to testify was ultimately the defendant's. *Enis*, 194 Ill. 2d at 399. Because the defendant has not shown that he was prejudiced by any deficient performance by counsel, we cannot say that counsel was ineffective.

¶ 43                                    III. CONCLUSION

¶ 44        The judgment of the circuit court of Kankakee County is affirmed.

¶ 45        Affirmed.